Jason Harrow
(Cal. Bar No. 308560)
Gerstein Harrow LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*Pro hac vice application forthcoming*)
Gerstein Harrow LLP
611 Pennsylvania Ave SE, No. 317
Washington, DC 20003
charlie@gerstein-harrow.com
(202) 670-4809

Chris Williams
Sheila Maddali
Ryan H. Nelson
National Legal Advocacy Network
1 N LaSalle St., Suite 1275
Chicago, IL 60602

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ONE FAIR WAGE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DARDEN RESTAURANTS, INC., <br><br> Defendant. | Case No. 4:21-cv-2695 <br><br> **COMPLAINT** <br><br> **Date: April 15, 2021** |

## <u>Preliminary Statement</u>

1. The lowest legal cash wage in the United States is $2.13 per hour. It is legal to pay employees this wage only if they are within a narrow class of service employees who receive tips, like restaurant servers and bartenders, and if paying this wage does not violate any other laws. But paying such a low

cash wage increases sexual harassment in the workplace, and encouraging or facilitating tipping without mediating that process creates a clear and significant tipped wage gap between employees of color and white employees. When a company adopts wage policies or practices like these that result in disparate, negative impacts on the basis of sex and race, and there is no business necessity for doing so, it engages in illegal employment discrimination under federal law.

2.     Defendant Darden Restaurants, Inc., has done just that. Darden maintains a national, corporate-level policy or practice that local managers must pay the lowest possible cash wage to all tipped employees. As a result, Darden pay tens of thousands of its roughly 175,000 employees the lowest legally-permissible cash wage and encourages and facilitates tipping on top of that without any mediation of its tipping process. In 43 states, this cash wage is called the "subminimum wage" because it is well below the minimum wage for non-tipped employees (which, at the federal level, is $7.25 per hour). Under federal law, only tipped employees are permitted to be paid a cash wage this low, and only then on the condition that, if the combined total of the employee's cash wages plus tips do not result in a total of $7.25 per hour, then the employer must make up the difference with an increased payment to bring that employee up to $7.25 per hour. Nothing in federal law requires tipped workers to be paid a subminimum wage or compels tipping in this manner, and nothing in federal law permits employers to pay a subminimum wage or compel tipping in this manner if doing either violates federal law.

3.     Darden's wage policies result in increased sexual harassment of workers and disparate wages for workers across racial groups. These effects violate the prohibitions on workplace discrimination in Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2.

4.      According to empirical and anecdotal data from current and former Darden employees, and supported by studies measuring the impact of wage policies like Darden's, the subminimum wage is the direct cause of, or at least a motivating factor in, a documented increase in sexual harassment. A key reason for this is that the subminimum wage puts great pressure on tipped employees to have the customers, rather than Darden, pay employees their legally-required wages. This, in turn, means that managers have an incentive to ignore, indulge, or even encourage sexual harassment, including requiring or encouraging employees to flirt or dress suggestively. Without Darden's cash wage policy, these illegal effects would be substantially lessened.

5.      Separately, Darden's tipping policy has led directly to, or was at least a motivating factor in, tipped employees of color being paid less in tips than tipped white employees. The reason is clear: it is Darden's corporate policy or practice to encourage and facilitate tipping for positions like servers and bartenders without mediation, which means that Darden, as a corporation, requires its customers to directly set the wage levels for tens of thousands of its employees without any oversight. But customers are often capricious, not systematic; they are often emotional, not rational; and they often bring conscious and unconscious racial and other biases with them when they eat out. Thus, whether intentional or not, and whether made by customers who have had two bottles of wine or none at all, customer decisions about whether and how much to tip have resulted in employees of color being paid meaningfully less than white employees because of their race. To be clear, tipping itself is not the problem. Rather, Darden's tipping policy, which does nothing to mitigate customers' tip choices, is the problem.

6.     Neither of these policies are job related or consistent with business necessity. Accordingly, Darden's cash wage policy and its tipping policy violate federal anti-discrimination law.

## Parties

7.     Plaintiff One Fair Wage, Inc. is a New York not-for-profit corporation with its principal place of business in Oakland, California. One Fair Wage is the leading organization seeking to lift millions of tipped and subminimum-wage-earning employees nationally out of poverty by requiring all employers to pay the full minimum wage as a cash wage with fair, non-discriminatory tips on top. One Fair Wage focuses specifically on helping employees in the restaurant industry.

8.     One Fair Wage, as an organization, has been injured by Darden's policies. Because Darden maintains the policies complained of here, One Fair Wage has been forced to divert its resources to address Darden employees' complaints that they have suffered more and worse sexual harassment than their coworkers of the same sex who are not subject to the policies, as well as complaints from Darden employees of color that they have received less in tips than their white coworkers. Moreover, One Fair Wage has lost money as a result of Darden's policies because One Fair Wage has paid more cash assistance from its Emergency Coronavirus Relief Fund to Darden employees subject to Darden's policies than One Fair Wage would have paid otherwise.

9.     Defendant Darden Restaurants, Inc. is a Florida corporation with its principal place of business in Florida. Darden is the largest operator of full-service restaurants in the world. It operates eight prominent restaurant chain brands, including The Olive Garden, LongHorn Steakhouse, and the Capital Grille. As of Darden's most recent annual report, there were 861 company-

owned Olive Gardens in the United States, which makes the Olive Garden the largest full-service-dining Italian restaurant chain in the country. The other seven brands that Darden owns operate another 1,000 or so restaurants. All told, Darden had sales of $7.81 billion dollars in fiscal year 2020, which included the first few months of the pandemic. Darden operates restaurants in all 50 states, including approximately 74 Olive Gardens and 25 Yard Houses in California with several thousand Darden employees working in California.

10.     Darden is an "employer" under Title VII, it has had more than 15 employees at all relevant times, and the policies that caused One Fair Wage harm applied to "employee[s]" of Darden, as that term is used under Title VII.

## **Jurisdiction**

11.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

## **Venue**

12.     Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) because Darden's unlawful employment practices were committed in California, implemented in California, and had their effects felt in California, and because the employment records relevant to those unlawful employment practices are maintained and administered in this judicial district.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and because Darden is subject to the court's personal jurisdiction with respect to this action in this judicial district.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Intradistrict Assignment

14.    Assignment to this division is proper because a substantial part of the events or omissions which give rise to the claims occurred in Alameda County, California.

### Darden's Wage Policies

15.    Darden maintains two corporate wage policies or practices that have caused and continue to cause the disparate impacts explained further below:  the cash wage policy and the tipping policy.

16.    Darden has maintained both of its wage policies for at least the twenty years preceding this action, continues to maintain these policies today, and has maintained these policies at all times relevant to this action.

### *Darden's Cash Wage Policy*

17.    Darden maintains a policy or practice of setting and enforcing a cash wage for all "tipped employees," as that phrase is defined within the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(t), that is equal to the lowest possible cash wage in the state or municipality in which that employee works. That is, in 43 states (and the 7 other states before state law eventually forbade it), Darden's policy or practice is to pay its tipped employees a subminimum wage, which is the lowest legally-permissible cash wage permitted and less than the minimum wage for non-tipped employees.

18.    For example, in the Team Member Handbook for one of Darden's brands, Darden states that "[t]his handbook briefly summarizes the policies and procedures of the family of Darden Restaurants" and that "[t]he goal of this handbook is to present policies and procedures that apply to all of Darden's restaurants." The handbook then states that, for "tipped team members,"

Darden "takes the maximum permissible 'tip credit'"—i.e., the difference between the cash wage and the minimum wage. Accordingly, Darden's cash wage policy requires all tipped employees at all restaurants nationwide to be paid the lowest, legally-permissible cash wage permitted.

19.    In February and March 2021, One Fair Wage conducted an informal poll of Darden employees. Hundreds of current and former Darden employees responded. Of those respondents who reported working only as a server for Darden, most told One Fair Wage that they were paid at or below the lowest legally-permissible cash wage. Many more told One Fair Wage that they were paid within a few cents of that. (Shockingly, roughly a quarter of servers reported being paid cash wages below what state law required.) This Darden-specific empirical data demonstrates the existence of a corporate-level cash wage policy or practice requiring local managers to pay tipped employees at Darden the lowest permissible cash wage which, in 43 states, is a subminimum wage as low as $2.13 per hour.

20.    Darden's cash wage policy dictates a common restriction on how local managers are prohibited from exercising their discretion over tipped employees' cash wage rates, and that directive pervades the entire company. Darden's policy is a corporate-level instruction to local managers that they must pay tipped employees a cash wage as low as applicable law allows.

21.    Darden enforces its policy by training local managers not to pay tipped employees a cash wage greater than legally permitted, prohibiting managers from doing the same (e.g., in its handbook), auditing tipped employees' cash wage rates, and investigating and potentially disciplining managers who violate the corporate policy and pay tipped employees more than the company-imposed cash wage ceiling.

22.     Although in 35 states the wage floor for tipped employees is higher than $2.13 per hour, and in 7 states there is no distinction for large employers between the minimum wage for tipped employees and non-tipped employees, Darden's policy of paying the lowest legally-permissible cash wage to tipped employees is applicable nationally to all tipped employees at Darden restaurants across the United States.

23.     For example, from July 2020 to December 2020, and absent any deviations applicable to local jurisdictions, the policy caused Darden to pay tipped employees working in South Carolina a cash wage of $2.13 per hour and those working in New York City a cash wage of $10.00 per hour. In South Carolina, Darden thus took the maximum tip credit of $5.12 per hour (i.e., the difference between the federal minimum wage of $7.25 per hour and $2.13 per hour in cash wages), and Darden was required to pay additional cash wages to its employees if their tips were insufficient to make up that difference. In New York City, the legally-imposed wage floor is higher, but the calculation is the same: Darden paid employees a cash wage of $10.00 per hour and took the maximum tip credit of $5.00 per hour (i.e., the difference between the statewide minimum wage of $15.00 per hour and $10.00 per hour in cash wages). As in South Carolina, Darden was required to directly pay its employees additional wages if their cash wages and tips did not sum to $15.00 per hour.

24.     In total, Darden pays roughly 20% of its entire workforce a cash wage of $2.13 per hour. That is the lowest legally-permissible cash wage nationwide, and it applies in 15 states.

25.     The majority of Darden's tipped employees are paid a subminimum wage that is lower than $7.25 per hour.

26.     Darden encourages employees who are paid a subminimum wage to try to earn enough tips to make up the difference between the tipped

minimum wage and the minimum wage, and it facilitates this through tracking and reporting tips, so Darden will not need to make up this difference in additional cash wages.

27.     Darden has fought to preserve its alleged right to maintain its cash wage policy by lobbying to preserve the subminimum wage of $2.13 per hour under federal law. Restaurant Opportunities Centers United, *Darden: At the Drop of a Dime* 1 (2020).[1]

### *Darden's Tipping Policy*

28.     Darden maintains a policy or practice of actively encouraging and facilitating, and essentially tacitly requiring, its customers to tip its tipped employees, including all servers and bartenders at all of its restaurants, without mediating that process in any way. In other words, Darden's policy encourages and facilitates tipping without interposing between customers tipping and employees taking those tips home as wages. The intent and effect of Darden's policy is that Darden's customers directly determine a large portion of the wages paid to Darden's tipped employees.

29.     Darden's active encouragement and facilitation of customer tipping as a form of employee compensation takes several forms. For instance, it is corporate policy that restaurants print a "tip" line on customers' bills; that restaurants recommend tip percentages on bills for perceived good service (although Darden does not audit this recommendation to confirm whether customers actually tip based on employee merit); and that restaurants post signage on menus, bills, and elsewhere encouraging customers to tip. Darden also actively facilitates its tipping policy by, for instance, maintaining the Tip

---

[1] https://rocunited.org/wp-content/uploads/sites/7/2020/02/DardenAtTheDropOfADime.pdf.

Reporting Alternative Commitment with the IRS, which is a voluntary agreement that requires employees to track and report tips to Darden and the IRS, and by disciplining employees who fail to accurately track and report tips to Darden and managers who acquiesce in the same.

30.     In the employee handbook described above, Darden acknowledges that it encourages and facilitates customers directly making compensation decisions for tipped employees and that Darden does not mediate that process. The handbook, which applies across all of Darden restaurants nationwide, states that, "[i]f you are a tipped team member, tips will account for a large portion of your earnings. The Internal Revenue Service requires that you accurately report the amount of tips you receive and keep. Under federal law, YOU MUST REPORT AND PAY INCOME TAXES ON 100% OF YOUR TIP INCOME." The handbook also advises Darden's tipped employees that "you should keep a daily record of the cash and charge tips you receive (many of the restaurants have tip logs available for you—ask a manager)." Hence, Darden's corporate-level tipping policy encourages and facilitates tipping for all tipped employees at all of its restaurants, even those employees who are paid a cash wage greater than a subminimum wage (e.g., tipped employees who work in states that require a cash wage for tipped employees equal to the minimum wage for non-tipped employees), without mediating that process.

31.     The poll referenced above confirms the existence of Darden's tipping policy. The overwhelming majority of respondents who identified their job as server or bartender reported receiving at least some tips in connection with working for Darden. This Darden-specific empirical data demonstrates the existence of a national, corporate-level tipping policy.

32.     Darden's tipping policy is a corporate-level restriction on local manager discretion that requires local managers to allow customers to tip

employees without any mediation of that process and to help facilitate that tipping. At the same time, the corporate policy does not permit local managers the discretion to use alternative systems, even if local managers know or suspect that those alternatives would better match employees' wages to employees' performance and would minimize any consideration of discriminatory factors (e.g., employee race) in pay received.

### Darden's Cash Wage Policy Increases Sexual Harassment

33.     Darden employees paid a subminimum wage pursuant to the cash wage policy suffered more and worse sexual harassment than Darden employees paid at least the minimum wage. The cash wage policy is the direct cause, or at least a motivating cause, of this disparate impact. That is, Darden's cash wage policy caused sex to play more of a role in the jobs of all employees subject to the policy, regardless of the employees' sexes.

34.     The poll referenced above showed that Darden employees paid a subminimum wage pursuant to the policy suffered more and worse sexual harassment than Darden employees paid the minimum wage. For example, Darden employees working where Darden's policy causes servers and bartenders to be paid a subminimum wage reported the following sexual harassment (emphasis added to highlight the significant frequency and severity of the sexual harassment):[2]

> a.      "Manage[r]s . . . would *typically* make comments on female workers bodies and their looks, weight, or how f\*\*kable they were";

---

[2] Not included in this list is one report of sexual harassment against a line cook. Although this was reported by an employee working where servers and bartenders are paid a subminimum wage, line cooks are entitled to the minimum wage.

b.  "A married kitchen manager described *almost daily*, in great detail, what he'd like to do to me if we were ever alone";

c.  "The head cook would *always* make very suggestive comments to me about my body and a manager would openly talk abo[u]t women working for Darden as well as customers";

d.  "I *often* hear male team members talking sexually about other team members and guests as well. It[']s just dis[g]usting. About their fantasies or specific body parts.";

e.  "As a woman, I got hit on *plenty*, and sexually harassed by *everybody* from coworkers to patrons/guests";

f.  "There were *frequent* incidents of men sexually harassing me";

g.  "Sexual jokes are *too common*, [and] people are too touchy";

h.  "I'm a homosexual and I [got] sexually harassed *a lot*";

i.  "There was *a lot* of sexual harassment going on in my store";

j.  "[There] was a ma[l]e server that *always* made *very* personal, sexual remarks";

k.  "Male [employees] *pretty regularly* made females feel uncomfortable and management did not do a whole lot about it";

l.  "As a bartender it's just part of the job, *many* customers make sexualized comments";

m.  "*Always* making fun of the way I talked, that it was typically how a homosexual sounds";

n.   "Unwanted remarks and touching from cooks";

o.   "Being sexually objectified by male coworkers";

p.   "A manager got my address without permission and called me drunk at 2 am trying to come see me as he was drunk";

q.   "[M]ale manager likes to hug but only female employees";

r.   "During training I was 'fought' over by male trainers[,] both of whom made sexual advances to me that same day after the shift off site";

s.   "Sexual harassment"; and

t.   "[S]exist jokes."

35.   In contrast, Darden employees working where Darden's policy causes servers and bartenders to be paid at least the minimum wage still reported sexual harassment in response to the poll, but not nearly the same amount or severity (emphasis added to highlight the limited frequency and severity compared to the sexual harassment reported above):

a.   "I've had couples give me their hotel room keys, men try to coerce me to drink with them on the job, also *constantly* being called 'sweetie' or 'honey' and putting their hands on me while serving them";

b.   "*Lots* of sexual harassment";

c.   "Had a manager pull me aside and ask me the sexual orientation of a fellow server"; and

d.   "Witness [s]exual harassment."

36.   Another specific example demonstrates how Darden's policy causes Darden employees paid a subminimum wage to suffer more and worse sexual harassment than Darden employees paid a minimum wage. In her recent Charge of Discrimination filed against Darden with the U.S. Equal

Employment Opportunity Commission ("EEOC"), Brooklynn Brunner (who was paid a subminimum wage pursuant to Darden's cash wage policy when she worked for Darden in New York City from March 2018 to March 2020) stated that she "and other similarly situated servers are put in a position to be compliant and allow sexual harassment by customers, based on our sex as female servers, because we are dependent on customers for tips" and, "[b]ecause of my increased vulnerability to sexual harassment due to my sex and reliance on tips for my livelihood, Darden's policy of paying the subminimum tipped wage has a disparate impact on me and similarly situated servers." Brunner also stated that she suffered "frequent sexual harassment by customers while working as a server. This includes inappropriate comments, being hit on, and more," including being "screamed and yelled at" by a male customer. She also gives examples of coworkers sexually harassing her, including one who was "grabbing my butt, telling me his genital size and asking me to grab it, saying sexually charged statements to me in passing, and more" and a second who was "forcibly unzipping my pants, grabbing my butt, and more."

37. Empirical evidence confirms that paying a subminimum wage increases sexual harassment. For example, in Restaurant Opportunities Centers United & Forward Together, *The Glass Floor: Sexual Harassment in the Restaurant Industry* 14, 16 (2017),[3] Figures 3.4, 3.5, & 3.6 show an increase in the amount of sexual harassment that employees suffer because they are paid a subminimum wage (as per Figure 3.4, increasing the mean total sexual harassment from roughly 9% for employees in states prohibiting subminimum wages to over 16% for employees in states allowing a subminimum wage).

---

[3] https://chapters.rocunited.org/wp-content/uploads/2014/10/REPORT_The-Glass-Floor-Sexual-Harassment-in-the-Restaurant-Industry2.pdf.

Another report similarly found that "[w]omen workers earning their state's full minimum wage before tips reported half the rate of sexual harassment as women in the states that pay $2.13 per hour." Lisa Baertlein, *U.S. Restaurant Workers Target Low Wages in Campaign Against Sexual Harassment*, Reuters (Feb. 13, 2018). Finally, a recent empirical study by One Fair Wage itself shows that "[t]ipped workers who receive a subminimum wage . . . experience sexual harassment at a rate far higher than their non-tipped counterparts"; "[t]ipped workers were sexually harassed significantly more frequently, in every way measured, than their non-tipped counterparts"; "[t]hese experiences represented not one-time harassment, but often persisted over days, weeks, and in some cases, months"; and "[w]hen workers reported the sexual harassment, tipped workers were less likely to say that the situation was corrected than their non-tipped counterparts." One Fair Wage, *The Tipping Point: How the Subminimum Wage Keeps Incomes Low and Harassment High* 2–3 (2021).[4] As explained in the following paragraphs, this increased sexual harassment is attributable to managers, customers, and coworkers.

38.    First, empirical data shows that employees paid a subminimum wage see an increase in management sexually harassing employees. To that end, *The Glass Floor* report found that female employees paid a subminimum wage were "three times more likely to be told by management to alter their appearance and to wear sexier, more revealing clothing" than female employees paid at least the minimum wage. *The Glass Floor*, *supra* ¶ 37, at 2–4. This is due, at least in part, to the perverse incentives created by the policy. Employers have a legal obligation to pay more cash wages if the tips received by an employee do not sum to the full tip credit, so managers are incentivized

---

[4] https://onefairwage.site/wp-content/uploads/2021/03/OFW_TheTippingPoint_3-1.pdf.

to encourage tipped employees to try to earn more in tips. Furthermore, "[d]ue to [management's] desire to keep customers happy, management can be unresponsive to, or even indulgent of customer misbehavior," including by "encourag[ing] sexual harassment from customers and co-workers by requiring employees to flirt and dress suggestively." *Id.* at 8. Once a worker is objectified in this way, the worker is much more vulnerable to being sexually harassed by everyone at work, not just customers. For example, managers sexually harass subminimum wage workers more than other workers because subminimum wage workers protest less out of a well-founded fear that managers will retaliate by assigning them worse shifts or less-desirable sections of the restaurant, thereby leading to less tips. Similarly, cooks and other "back-of-the-house" workers sexually harass subminimum wage workers more than other workers because subminimum wage workers protest less out of a well-founded fear that these coworkers will retaliate by preparing food in a way that doesn't match customers' demands, again leading to less tips. One Fair Wage has confirmed from many discussions with Darden employees that this incentive exists at Darden and plays out in Darden restaurants in precisely this way.

39.     Second, empirical data also shows that another repercussion of subminimum wages is an increase in customers sexually harassing employees. For example, *The Glass Floor* report found that, because employees depend on receiving enough tips to survive, "customers can feel entitled to treat servers inappropriately." *Id.* at 8. In another empirical study proving this point, customers viewed sexual harassment against a female employee as "more legitimate when she received tips." Oliver Klein et al., *Does Tipping Facilitate Sexual Objectification? The Effect of Tips on Sexual Harassment of Bar and*

*Restaurant Servers*, Equality, Diversity & Inclusion (2020).[5] Moreover, once a subminimum wage worker is objectified by managers and customers alike by being forced or encouraged to dress suggestively or flirt to get more tips, that worker is more vulnerable to sexual harassment from customers.

40.     Third, empirical data further shows that another repercussion of employees being paid a subminimum wage, and thus being pressured by management to flirt with customers and dress suggestively to try to earn enough tips to survive, is an increase in coworkers sexually harassing employees who are now flirting more and dressing more suggestively at work and holding subminimum wage workers' tips over their heads (e.g., refusing to prepare food in the way the customer wants it unless the server acquiesces to sexual harassment). For example, *The Glass Floor* report found that "[t]ipped workers experienced higher rates of sexual harassment from co-workers in nearly every category than non-tipped workers." *The Glass Floor*, *supra* ¶ 37, at 18.

41.     Finally, empirical data also shows that another repercussion of employees being paid a subminimum wage is an increase in those employees begrudgingly allowing sexual harassment to persist. Employees may acquiesce in, or even reluctantly espouse consent to, such unwelcome conduct under the threat of receiving less in tips, suffering retaliation by managers by being assigned unfavorable shifts or tables, being humiliated publicly or privately by their managers or coworkers, or even being fired. Dana Yagil, *When the Customer Is Wrong: A Review of Research on Aggression and Sexual Harassment in Service Encounters*, 13(2) Aggression & Violent Behavior 141, 144 (2008) ("Managers tend to exclude waitresses who complain about

---

[5] https://www.emerald.com/insight/content/doi/10.1108/EDI-04-2019-0127/full/html.

harassment from the best tipping shifts and service stations."). To that end, "it becomes difficult for workers to effectively draw lines between providing good service and tolerating inappropriate behavior from customers," "[w]omen workers are often required or feel the need to dress or act in a sexualized manner in order to secure larger checks and tips from customers," and "[w]omen restaurant workers often have to tolerate inappropriate comments and sexual harassment while at work in order to ensure their earnings are not impacted negatively and to maintain job security." Indeed, "over 50% of tipped women workers agreed that depending on tips had led them to tolerate inappropriate behaviors that made them nervous or uncomfortable." *The Glass Floor*, *supra* ¶ 37, at 8.

42.     Anecdotal evidence confirms that employees paid a subminimum wage suffer more and worse sexual harassment than employees paid at least the minimum wage. Michelle Alexander, *Tipping Is a Legacy of Slavery*, N.Y. Times (Feb. 5, 2021); Catrin Einhorn & Rachel Abrams, *The Tipping Equation*, N.Y. Times (Mar. 12, 2018); Fatima Hussein, *How Low Wages for Tipped Workers May Invite Sexual Harassment*, Indystar (Feb. 23, 2018).

43.     Because of the disproportionate quantity and quality of sexual harassment suffered by the Darden employees subject to the policy, those employees report and complain about sexual harassment to management and rebuff sexual harassment from customers more than Darden employees who are not subject to the policy, causing employees subject to the policy to suffer more financial retaliation from managers and customers. For example, Darden employees subject to the policy receive less in tips from rebuffed sexual harassers and are assigned worse tables or sections of the restaurant by the managers that they accused of sexual harassment.

44.     Darden's cash wage policy perpetuates a cycle of systemic sexual harassment. Darden imposes a subminimum wage ceiling on tipped employees in 43 states. That leads to employees paid pursuant to the policy suffering more and worse sexual harassment than their coworkers who are not subject to the policy, which causes them to receive less pay because of the increased levels and severity of sexual harassment, forcing them to rely even more on tips and keeping their job just to make ends meet, which leads them to suffer even more and worse sexual harassment, and so on.

## Darden's Tipping Policy Causes Darden's Employees of Color to Earn Less in Tips Than Darden's White Employees

45.     Because of Darden's tipping policy, Darden's employees of color receive less in tips, all else being equal, than Darden's white employees because of employees' races. That, in turn, means that Darden causes employees of color to be paid substantially less than white employees because of their race.

46.     In particular, Darden has adopted a corporate policy or practice of encouraging and facilitating tipping for jobs like servers and bartenders, which results in customers directly determining a substantial part of these tipped employees' total wages. But Darden has failed to mediate that process (e.g., ensure that customers do not consider race or any other prohibited characteristic in deciding what amount to tip, ensure that employees' take-home pay is untainted by such considerations). It is thus unsurprising that Darden's customers regularly consider race in setting compensation for Darden employees and that tipped employees see the impact of those considerations on their paychecks. Darden does nothing to stop the practice of customers setting

wages by caprice rather than merit; rather, it affirmatively encourages and facilitates such disparities to thrive.

47.     The facts are stark. One Fair Wage's poll of Darden workers mentioned above demonstrated that Darden's servers of color who received any tips in 2020 received roughly 82.04% of the tips per hour that Darden's white servers who received any tips in 2020 received (this Darden-specific sample data approximates the empirical data discussed below, *infra* ¶ 52, suggesting that Darden-wide population data would likewise demonstrate a similar, race-based tip disparity). Specifically, Darden's servers of color who reported receiving any tips in 2020 received a median of roughly $7.31 in tips per hour, whereas Darden's white servers who reported receiving any tips in 2020 reported receiving a median of roughly $8.91 in tips per hour. This Darden-specific, empirical evidence demonstrates that Darden's tipping policy causes race to be at least a motivating factor in how much money Darden employees receive and significantly harms servers of color. To that end, one Darden employee told One Fair Wage that "black servers are tipped lower" than servers of other races/ethnicities, and another told One Fair Wage, "[b]ecause I was black I would mainly [g]et all the black people.  I over heard guest not liking Mexican and black people.  My white co workers made more money than me."

48.     Darden's corporate-level tipping policy also allows local manager biases to affect employees' wages. Forcing employees to be paid in tips without mediating that process places great importance on the shifts worked and sections covered for at least two reasons:  dinner shifts and shifts on prime nights like weekends generally result in higher tips than lunch shifts and shifts on weekdays; and prime seating sections within each restaurant generally result in higher tips than non-prime sections because customers in

prime sections may be wealthier, spend more money, or be used to paying higher tips. But Darden's tipping policy has the effect of local managers relegating servers of color and bartenders of color to less-lucrative shifts and less-prime sections, which results in them receiving less in tips based on their race.

49.     Specific examples highlight the effects of Darden's tipping policy. For example, in their recent charges filed with the EEOC, Chanta Hunter (a Black employee who has worked for Darden in New York City since October 2006), Luna St Furcy (a Caribbean-American employee who worked for Darden in the same location from June 2018 to March 2020), and Adam Jones (a Black employee who has worked for Darden at the same location since September 2008) stated that they, as well as other servers of color and bartenders or color, received less in tips based on their race because of this policy. Moreover, in her recent charge filed with the EEOC, Pam Araiza (a Latina employee who worked for Darden in Naples, FL from 2007 until May 2017 and Washington, DC from May 2017 until 2020) alleged that she was "consistently assigned to sections of the restaurant known to generate less in tips, which management referred to as 'Section 8' or 'my low-income world.'"

50.     Darden's employees of color have suffered, and continue to suffer, significant harm because of Darden's tipping policy. Using the median tips per hour data from the poll referenced above, if all tipped Darden employees were to work full-time (i.e., 2,080 hours per year), tipped white Darden employees would each receive roughly $18,536.70 in tips annually, whereas tipped Darden employees of color would each receive roughly $15,206.59 in tips annually—a race-based difference of $3,330.11 in tips per year per worker. For essential workers already receiving a subminimum wage and living paycheck to paycheck just to try to make ends meet, that difference is significant.  To

put into context how significant this Darden-imposed pay differential is, one African American server told One Fair Wage that he "had to get a therapist because of the lack of money I was receiving at the job," that he "would make half the amount of coworkers" because of race, and that he has "depression and ptsd and suffer[s] from anxiety/ panic attacks" because of his job at Darden.

51.     Darden employs roughly 167,000 hourly employees, roughly 51% of whom identify as racial or ethnic minorities. The majority of Darden's hourly employees are tipped employees. Thus, Darden employs tens of thousands of tipped employees of color, upon each of whom it is inflicting at least several thousands of dollars of entirely-preventable, race-based pay discrimination every year due to its tipping policy. That adds up to hundreds of millions of dollars that Darden's tipping policy illegally wrests from its employees of color.

52.     Empirical research confirms these Darden-specific results and shows that this disparity is a predictable consequence of maintaining a policy or practice of encouraging and facilitating tips without any mediation. For example, one empirical study found that black servers receive about 78% of the tips that white servers receive. Zachary W. Brewster & Gerald Roman Nowak III, *Racial Prejudices, Racialized Workplaces, and Restaurant Servers' Hyperbolic Perceptions of Black–White Tipping Differences*, 60(2) Cornell Hospitality Quarterly 159, 163 tbl. 1 (2019) (the average tip percent for black servers was 14.05%; the average tip percent for white servers was 18.00%); *see also* Zachary W. Brewster & Michael Lynn, *Black–White Earnings Gap Among Restaurant Servers: A Replication, Extension, and Exploration of Consumer Racial Discrimination in Tipping*, 84 Sociological Inquiry 545, 557 (2014); Michael Lynn et al., *Consumer Racial Discrimination in Tipping: A Replication and Extension*, 38 J. Applied Soc. Psych. 1045, 1055–56 (2008); Gabriela Quintana, *I'm Going to Tip Minority Servers More – and Whites Less*, Econ.

Opportunity Inst. (Oct. 16, 2018), http://www.opportunityinstitute.org/blog/post/im-going-to-tip-minority-servers-more-and-white-servers-less/.

53.     Anecdotal evidence also confirms that customers generally tip white servers more than servers of color. Alexander, *supra* ¶ 42; Casey Quinlan, *D.C. Servers and Bartenders Say the Tipped Wage System Isn't Working for Them*, Think Progress (June 12, 2018), https://archive.thinkprogress.org/should-dc-restaurants-pay-minimum-wage-these-servers-and-bartenders-think-so-c560d2269e7f//; Restaurant Opportunities Centers United, *Ending Jim Crow in America's Restaurants: Racial and Gender Occupational Segregation in the Restaurant Industry* 26 (2015), https://chapters.rocunited.org/wp-content/uploads/2015/10/RaceGender_Report_LR.pdf; Kimberly Freeman Brown & Marc Bayardon, *When Tipping Doesn't Make the Difference*, Ebony (Feb. 15, 2016), https://www.ebony.com/news/restaurant-women-tipping-wage/.

54.     Anecdotal evidence confirms that restaurant managers (or those with similar authority) assign customers to servers based on servers' races, assigning black customers who the manager suspects will not tip well to servers of color and assigning white customers who the manager suspects will tip well to white servers. Alexander, *supra* ¶ 41; Vince Dixon, *The Case Against Tipping in America*, https://www.eater.com/a/case-against-tipping (citing Zachary Brewster et al., *Consumer Racial Profiling in U.S. Restaurants: Exploring Subtle Forms of Service Discrimination Against Black Diners*, 29 Sociological Forum 476 (2014)).

55.     Darden has tacitly admitted that its managers have assigned customers to servers based on servers' races when it fired a manager who did

so. Meryl Kornfield, *An Olive Garden Customer Demanded a Non-Black Server. The Manager Who Complied Has Been Fired.*, Wash. Post (Mar. 5, 2020), https://www.washingtonpost.com/food/2020/03/05/olive-garden-manager-black-server/.

56.     The race-based wage gap in tips received by Darden employees of color and their similarly-situated white coworkers is exacerbated by Darden's cash wage policy which causes the overwhelming majority of tipped Darden workers to be paid a subminimum wage. To that end, Darden employees of color, to whom Darden already pays the lowest legally-permissible cash wages in most cases, are subjected to even-greater poverty by being denied more in tips because of their race, causing employees of color subject to the policy to receive less total pay (i.e., cash wages and tips) than their similarly-situated white coworkers because of their race.

57.     Darden's tipping policy perpetuates a cycle of systemic race discrimination against people of color: Darden encourages customers to tip and facilitates tipping without any mediation, which leads to Darden's employees of color receiving less in tips than their white coworkers because of their race, which forces Darden's employees of color to rely even more on tips just to make ends meet, which causes those employees of color to receive even less in tips than their white coworkers because of their race, and so forth.

**Darden's Cash Wage Policy Is Neither Consistent with Business Necessity nor Related to Darden Employees' Jobs**

58.     Many of Darden's competitors, such as other restaurants and food service and hospitality businesses, profitably operate restaurants and other similar businesses without maintaining a cash wage policy like Darden's and

without forcing their local managers to pay employees a subminimum wage, showing that the cash wage policy is not consistent with business necessity.

59.     Darden would continue to remain profitable if it rescinded the policy and maintained a cash wage ceiling equal to the non-tipped minimum wage or allowed local management the discretion to do the same, proving again that the policy is not consistent with business necessity.

60.     Nothing about positions like servers and bartenders at Darden suggests that those positions must receive the lowest legally-permissible pay, whereas other positions at Darden can be paid a higher cash wage rate at the discretion of local managers. As such, the policy is not a legitimate measure or qualification of the specific jobs that it applies to, demonstrating that the policy is not job related.

## There Are Less Discriminatory Alternatives to the Cash Wage Policy

61.     Darden could reduce or eliminate the more severe and pervasive sexual harassment suffered by its employees who are paid a subminimum wage pursuant to the policy by adopting a less-discriminatory alternative. For example, Darden could adopt a practice that sets and enforces a cash wage ceiling equal to the non-tipped minimum wage, and doing so would not cause Darden to become unprofitable.

## Darden's Tipping Policy Is Neither Consistent with Business Necessity nor Related to Darden Employees' Jobs

62.     Many of Darden's competitors, such as other restaurants and food service and hospitality businesses, profitably operate restaurants and similar businesses without maintaining a tipping policy like Darden's—for example, requiring employees to pool their tips to mitigate against any race-based

disparities in tips received or; providing effective rules or standards for customers that minimize race-based differences in tips received; or minimizing the effects of tipping by adding a standard service charge to all bills to be paid to employees and letting customers tip on top (which very few do, thereby bypassing most customers' tip choices)—proving that Darden's tipping policy is not consistent with business necessity.

63.    Darden would continue to remain profitable if it rescinded the tipping policy and adopted any of these less-discriminatory alternatives, demonstrating that its tipping policy is not consistent with business necessity.

64.    The tipping policy is not a legitimate measure or qualification of the specific jobs that it applies to (e.g., servers, bartenders), proving that it is not job related. Indeed, the tipping policy encourages customers to directly compensate employees based on factors whose consideration is illegal and irrelevant (e.g., race), and nothing about positions like servers and bartenders suggests that they must be subjected to the policy whereas other positions are not. Thus, Darden's tipping policy actively untethers pay from legitimate job performance metrics.

## There Are Less Discriminatory Alternatives to the Tipping Policy

65.    Darden could ensure that its employees of color receiving tips do not receive less in tips than white employees receiving tips by adopting any of the less-discriminatory alternatives referenced above.  These alternatives would not cause Darden to become unprofitable, but Darden chooses instead to maintain its tipping policy.

1

## **Darden's Policies Have Adversely Affected One Fair Wage**

2

66.     Darden's maintenance of the policies has caused monetary and

3

non-monetary harm to One Fair Wage. One Fair Wage is not filing this action

4

on behalf of any Darden employees or representing any Darden employees

5

here; rather, One Fair Wage is seeking redress only for the harm that Darden's

6

policies have caused to One Fair Wage as an organization.

7

67.     The policies have caused, and continue to cause, One Fair Wage

8

to divert its resources. For example, One Fair Wage has been forced to address

9

complaints from Darden employees subject to the cash wage policy that they

10

have suffered more and worse sexual harassment because of their sex than

11

Darden employees not subject to that policy, as well as complaints from Darden

12

tipped employees of color that they have received less in tips than Darden

13

tipped white employees because of their race (the vast majority of whom suffer

14

substantially because Darden already pays them a subminimum wage).

15

68.     For example, Saru Jayaraman, One Fair Wage's President who

16

works for One Fair Wage in, and directs One Fair Wage's actions from,

17

Oakland, California, spends a significant amount of her time dealing with

18

complaints from such Darden employees. Julia Sebastian, One Fair Wage's

19

Research Director who works in Oakland, California, spends roughly one-

20

fourth of her time working for One Fair Wage dealing with such complaints

21

from Darden employees and otherwise responding to the effects of the policies

22

on those employees.

23

69.     Many other One Fair Wage employees and consultants have

24

spent at least a portion of their work time dealing with such complaints and

25

otherwise responding to the effects of the policies on Darden employees, costing

26

One Fair Wage significant financial resources and time and energy it would

27

not have expended otherwise. As such, because of Darden's policies, One Fair

28

Wage spends tens of thousands of dollars annually, if not more, in salary and consultant payments, employees' benefits, office supplies, digital engagement fees, and other expenses, as well as hundreds of hours of staff and consultant time, all of which could have been spent on other matters but for Darden maintaining its unlawful policies.

70.     Because Darden maintains the policies, One Fair Wage has diverted significant staff time to conducting the Survey to determine whether Darden employees suffered more and worse sexual harassment because of their sex because of the cash wage policy or received less in tips due to their race because of the tipping policy.

71.     In response to the coronavirus pandemic, One Fair Wage established the Emergency Coronavirus Relief Fund, which provides cash assistance to restaurant workers who have had their hours reduced or have been furloughed or laid off and apply for cash relief from One Fair Wage.

72.     To date, One Fair Wage has paid cash relief from the fund of $500 per employee to more than 350 Darden employees nationwide (including more than 30 Darden employees in California), for a total of over $175,000 in cash assistance paid to Darden employees affected by the coronavirus pandemic (over $15,000 of which was paid to Darden employees in California). One Fair Wage paid essentially all of that cash relief to Darden's tipped employees who are (or were, prior to being laid off or furloughed) paid a subminimum wage.

73.     Because of the policies, Darden's employees have suffered more financially during the pandemic than their similarly situated coworkers who are not subject to the policies. As such, more Darden employees subject to the policies requested and received cash assistance payments from One Fair Wage's Emergency Coronavirus Relief Fund than would have requested and received such cash assistance payments but for the policies, depleting One Fair

Wage's funds more than they would have been depleted but for the policies and denying One Fair Wage the opportunity to pay more cash assistance to other restaurant workers during the pandemic.

74.    All of these adverse effects on One Fair Wage were foreseeable repercussions of Darden maintaining the policies. Darden's maintenance of the policies was a proximate cause and a but-for cause of all of these adverse effects on One Fair Wage.

## Timeliness and Administrative Exhaustion

75.    Darden has maintained the policies at all times relevant to this action and continues to maintain the policies today.

76.    On or about September 29, 2020, One Fair Wage filed a Charge of Discrimination with the EEOC Oakland Local Office alleging race- and sex-based disparate impact that materially tracks the allegations in this Complaint.

77.    On March 4, 2021 the EEOC dismissed that charge at One Fair Wage's request and issued One Fair Wage a right to sue notice.

78.    One Fair Wage has filed this action within the 90-day timeframe permitted pursuant to that right to sue notice.

## COUNT ONE:  SEXUAL HARASSMENT

## Darden's Policies Disparately Impact Employees Paid a Subminimum Wage by Causing Them to Suffer More and Worse Sexual Harassment in Violation of Title VII, 42 U.S.C. § 2000e-2(a)

79.    One Fair Wage incorporates the preceding paragraphs by reference.

80.     With respect to employees paid a subminimum wage, the policies are not capable of separation for the purpose of disparate impact analysis, so they constitute a particular employment policy or practice under Title VII.

81.     Darden's policies cause a disparate impact against all Darden employees—regardless of whether their sex is male, female, intersex, non-binary, or anything else—by causing them to suffer more and worse sexual harassment than Darden employees of their same sex who are not subject to the policies due to their sex. The policies cause sex to be a motivating factor in the quantity and quality of sexual harassment suffered by Darden employees. In other words, because of the policies, sex plays more of a role in all Darden employees' work.

82.     In the alternative, Darden's cash wage policy alone causes disparate impact against Darden employees by causing them to suffer more and worse sexual harassment than Darden employees of their same sex who are not subject to the cash wage policy due to their sex, and the cash wage policy alone causes sex to be a motivating factor in the quantity and quality of sexual harassment suffered by Darden employees.

83.     Neither of the policies is job related.

84.     Neither of the policies is consistent with business necessity.

85.     At least one alternative, less-discriminatory employment practice would be as effective as the policies at achieving Darden's lawful aims, but Darden refuses to adopt such an alternative employment practice.

86.     Accordingly, Darden's policies constitute an unlawful employment practice.

87.     In the alternative, Darden's cash wage policy alone constitutes an unlawful employment practice.

88.    Darden's maintenance of the policies or, in the alternative, the cash wage policy alone, has damaged One Fair Wage and forced it to divert resources.

89.    One Fair Wage is a person aggrieved by Darden's unlawful employment practice.

90.    The foregoing constitutes unlawful disparate impact because of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

## COUNT TWO:  RACE DISCRIMINATION

### Darden's Tipping Policy Disparately Impacts Tipped Employees of Color Based on Race with Respect to the Total Pay they Receive in Violation of Title VII, 42 U.S.C. § 2000e-2(a)

91.    One Fair Wage incorporates the preceding paragraphs by reference.

92.    Darden's tipping policy causes disparate impact against Darden employees of color who receive tips based on their race by causing them to receive less in tips than white Darden employees who receive tips. The tipping policy causes race to be a motivating factor in the dollar amount of tips received by Darden employees of color.

93.    Darden's tipping policy is not job related.

94.    Darden's tipping policy is not consistent with business necessity.

95.    At least one alternative, less-discriminatory employment practice would be as effective as Darden's tipping policy at achieving Darden's lawful aims, but Darden refuses to adopt such an alternative employment practice.

96.    Accordingly, Darden's tipping policy constitutes an unlawful employment practice.

97.   Darden's maintenance of its tipping policy has damaged One Fair Wage and forced it to divert resources.

98.   One Fair Wage is a person aggrieved by Darden's unlawful employment practice.

99.   The foregoing constitutes unlawful disparate impact because of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

## Prayer for Relief

100.   Plaintiff One Fair Wage respectfully requests:

    a.   Declaratory relief that the policies are unlawful and violate 42 U.S.C. § 2000e-2(a);

    b.   An injunction prohibiting Darden from maintaining the policies and any related employment policies or practices that also constitute unlawful employment practices;

    c.   Equitable or monetary relief redressing the resources that One Fair Wage has been forced to divert and the harm that One Fair Wage has suffered because of the policies;

    d.   Reasonable attorneys' fees and costs; and

    e.   Any other relief that this Court deems proper.

Respectfully submitted,

*/s/ Jason Harrow*
Jason Harrow
(Cal. Bar No. 308560)
Gerstein Harrow LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

1

2
Charles Gerstein
(*Pro hac vice application forthcoming*)
3
Gerstein Harrow LLP
611 Pennsylvania Ave SE, No. 317
4
Washington, DC 20003
charlie@gerstein-harrow.com
5
(202) 670-4809

6

7
Chris Williams
Sheila Maddali
Ryan H. Nelson
8
National Legal Advocacy Network
1 N LaSalle St., Suite 1275
9
Chicago, IL 60602

10
*Attorneys for Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**