UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ONE FAIR WAGE, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>DARDEN RESTAURANTS INC.,<br><br>    Defendant. | Case No.  21-cv-02695-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Docket No. 44 |

## I.      INTRODUCTION

Plaintiff One Fair Wage ("OFW"), an advocacy organization focused on eliminating the subminimum cash wage, has filed suit against Defendant Darden Restaurants, Inc. ("Darden"). OFW alleges that Darden's cash wage and tipping policies result in increased sexual harassment and disparate wages for workers across racial groups, and that these sex and race-based effects violate the prohibitions on workplace discrimination in Title VII of the Civil Rights act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2.  *See* Docket No. 41 ("FAC").  OFW did not file this action on behalf of any Darden employee.  Rather, OFW seeks redress for the harm that Darden's policies have caused OFW as an organization.  Now pending is Darden's 12(b)(1) Motion to Dismiss for lack of standing.  *See* Docket No. 44 ("Mot.").

## II.      RELEVANT BACKGROUND

A.      Procedural Background

On September 29, 2020, OFW filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging race and sex based disparate impact as a result of Darden's employment policies.  *See* FAC ¶ 101.  The EEOC dismissed that

United States District Court
Northern District of California

charge at OFW's request and issued OFW a right to sue notice. *See id.* ¶ 102. OFW filed the instant suit on April 14, 2021. *See* Docket No. 1. Darden filed three Motions to Dismiss on July 20, 2021. *See* Docket Nos. 15, 16, 17. On September 14, 2021, this Court dismissed OFW's suit, determining OFW's claims were not within the zone-of-interests of Title VII, but declining to determine whether OFW had Article III standing. *See* Docket No. 30 ("MTD Order").

OFW appealed and the Ninth Circuit vacated this Court's order and remanded for further proceedings. *See One Fair Wage, Inc. v. Darden Restaurants Inc.*, No. 21-16691, 2023 WL 2445690 (9th Cir. Mar. 10, 2023). The court held "that federal courts cannot proceed to the merits without first assuring themselves of their Article III jurisdiction." *Id.* at *2 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). The court noted that whether a claim falls within the zone-of-interests of a statute, or whether a party has "statutory standing," does not implicate a court's "constitutional power to adjudicate [a] case," and instead "is properly viewed as a dismissal for failure to state a claim rather than a dismissal for lack of subject matter jurisdiction." *Id.* (first quoting *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014); and then quoting *Vaughn v. Bay Env't Mgmt., Inc.*, 567 F.3d 1021, 1024 (9th Cir. 2009)). As such, the court concluded that this Court erred by deciding Darden's motion to dismiss on statutory grounds before determining whether OFW had Article III standing. *Id.* at *3.

On May 4, 2023, OFW filed its First Amended Complaint. *See* FAC. The First Amended Complaint contains additional allegations that purport to further establish OFW's Article III standing. *Id.* ¶¶ 91–98.

B.   Factual Background

OFW is a New York nonprofit organization with its principal place of business in Oakland, California. *See* FAC ¶ 7. OFW's organizational purpose is to "lift millions of tipped and subminimum-wage-earning" restaurant workers out of poverty "by requiring all employers to pay the full minimum wage as a cash wage with fair, nondiscriminatory tips on top." *Id.* Darden is a Florida corporation with its principal place of business in Orlando, Florida—it is the largest operator of full-service restaurants in the world. *See id.* ¶ 9.

At issue are two of Darden's corporate wage related policies (cash wage and tipping described below) which allegedly cause increased sexual harassment and race-based disparate impacts in Darden's workplaces in violation of Title VII. *See id.* ¶¶ 15–16, 104–24.

    1.    Cash-Wage Policy

Darden enforces a cash wage for all "'tipped employees,'" as defined by the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(t) ("FLSA"),[1] that is equal to the lowest possible cash wage in the state or municipality in which that employee works. FAC ¶ 17. This policy is incorporated into Darden's handbook. *Id.* ¶ 18. As such, in the 43 states where state law permits this type of policy, Darden's practice is to pay "tipped employees a subminimum wage, which is the lowest legally-permissible cash wage permitted and less than the minimum wage for non-tipped employees." *Id.* ¶ 17. In effect, employees subject to the policy are paid less than the minimum wage because tips are used to cover the difference between the tipped and non-tipped wage.

In 2021, OFW conducted a survey ("Survey") of hundreds of current and former Darden employees and found that those who worked as tipped servers for Darden were "paid at or below the lowest legally-permissible cash wage." *Id.* ¶ 19. OFW asserts that this empirical data, combined with the instruction in Darden's handbook, *id.* ¶ 18, proves the cash wage policy is "a corporate-level instruction to local managers that they must pay tipped employees a cash wage as low as applicable law allows." *Id.* ¶ 20.

In this case, OFW alleges that Darden's cash wage policy directly results in increased sexual harassment because the policy "causes sex to play more of a role in the jobs of all employees subject to the policy . . . ." *Id.* ¶ 33. That is, Darden employees subject to the cash wage policy face the difficult choice of having to tolerate sexual harassment from customers because the employees rely on customers' tips for a significant portion of their income. *See id.* ¶

---

[1] Under the FLSA, an employer is required to pay a tipped employee an amount equal to "the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and []an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in clause (i) and the wage in effect under section 206(a)(1) [minimum wage] of this title." 29 U.S.C. § 203(2)(A).

United States District Court
Northern District of California

65.  OFW also argues that employees subject to a subminimum wage are "pressured by management to flirt with customers and dress suggestively to try to earn enough tips to survive." *Id.* at ¶ 63.  Citing their Survey results, OFW highlights complaints made by some of Darden's cash wage employees of sexual harassment from customers and other Darden employees.  *Id.* ¶ 34. To further support its claim, OFW cites a Darden cash wage employee's EEOC complaint that alleges she was subject to sexual harassment from customers and coworkers.  *See id.* ¶ 60.  OFW argues that because Darden's cash wage employees suffer more frequent and severe sexual harassment from customers in comparison to Darden's other employees (*i.e.*, minimum wage employees), the cash wage employees suffer more financial retaliation from managers and customers because they complain of and rebuff more sexual harassment.  *See id.* ¶ 67.  As such, OFW argues that Darden's cash wage policy "perpetuates a cycle of systemic sexual harassment." *Id.* ¶ 68.[2]

### 2.    Tipping Policy

OFW contends that Darden encourages and "tacitly requires" its customers to tip its tipped employees "without mediating that process in any way." *Id.*  ¶ 28.  OFW cites (1) pooling tips and (2) adding a standard service charge to all bills and letting customers tip on top of the charge as examples of appropriately mediating customer tipping.  *Id.* ¶ 86.  OFW argues the effect of Darden's unmediated tipping policy is that "Darden's customers directly determine a large portion of the wages paid to Darden's tipped employees." *Id.*  OFW asserts that Darden actively facilitates this tipping policy by including a "tip line" and recommended tip percentages on the bill, as well as hanging signage that encourages customers to tip.  *Id.*  In addition, OFW notes that Darden maintains a Tip Reporting Alternative Commitment with the Internal Revenue Service ("IRS") that requires employees to track and report their tips to both Darden and the IRS.  *See id.* ¶ 29.

---

[2] *See*, *e.g.*, Restaurant Opportunities Centers United & Forward Together, *The Glass Floor: Sexual Harassment in the Restaurant Industry* 14, 16 (2017); Lisa Baertlein, *U.S. Restaurant Workers Target Low Wages in Campaign Against Sexual Harassment*, Reuters (Feb. 13, 2018); Catrin Einhorn & Rachel Abrams, *The Tipping Equation*, N.Y. Times (Mar. 12, 2018); Fatima Hussein, *How Low Wages for Tipped Workers May Invite Sexual Harassment*, Indystar (Feb. 23, 2018).

United States District Court
Northern District of California

OFW contends that Darden's unmediated tipping policy results in employees of color receiving less in tips than white employees (presumably because Darden's customers afford less favorable treatment to employees of color than to white employees).  *See id.* ¶ 69.  As such, "Darden causes employees of color to be paid substantially less than white employees because of their race."  *Id.*  Because Darden does not mediate the tipping process, customers who might consider race when determining compensation, "directly determine a substantial part of these tipped employees' total wages."  *Id.* ¶ 70.  In support, OFW cites its Survey that revealed, *inter alia*, "Darden's servers of color who received any tip in 2020 received roughly 82.04% of the tips per hour that Darden's white servers who received any tips in 2020 received."  *See id.* ¶ 71.  OFW also cites empirical studies and anecdotal evidence which allegedly confirms "this disparity is a predictable consequence of maintaining" its unmediated tip policy,[3] and anecdotal evidence which confirms "that customers generally tip white servers more than servers of color."  *Id.* ¶ 77.[4]

Additionally, Darden's unmediated tipping policy gives managers discretion to assign tipped employees of color to less desirable and less lucrative shifts and restaurant sections, "resulting in them receiving less tips based on their race."  *Id*. ¶ 72.  In support of this claim, OFW cites charges filed with the EEOC from Darden employees stating the same.  *See id.* ¶ 73.  OFW also cites anecdotal evidence which allegedly "confirms that restaurant managers assign customers

---

[3] Zachary W. Brewster & Michael Lynn, Black–White Earnings Gap Among Restaurant Servers: A Replication, Extension, and Exploration of Consumer Racial Discrimination in Tipping, 84 Sociological Inquiry 545, 557 (2014); Michael Lynn et al., Consumer Racial Discrimination in Tipping: A Replication and Extension, 38 J. Applied Soc. Psych. 1045, 1055–56 (2008); Gabriela Quintana, I'm Going to Tip Minority Servers More – and Whites Less, Econ. Opportunity Inst. (Oct. 16, 2018), http://www.opportunityinstitute.org/blog/post/im-goingto-tip-minority-servers-more-and-white-servers-less/.

[4] Michelle Alexander, *Tipping Is a Legacy of Slavery*, N.Y. Times (Feb. 5, 2021); Casey Quinlan, *D.C. Servers and Bartenders Say the Tipped Wage System Isn't Working for Them*, Think Progress (June 12, 2018), https://archive.thinkprogress.org/should-dc-restaurants-pay-minimum-wagethese-servers-and-bartenders-think-so-c560d2269e7f//; Restaurant Opportunities Centers United, *Ending Jim Crow in America's Restaurants: Racial and Gender Occupational Segregation in the Restaurant Industry* 26 (2015), https://chapters.rocunited.org/wpcontent/uploads/2015/10/RaceGender_Report_LR.pdf; Kimberly Freeman Brown & Marc Bayardon, *When Tipping Doesn't Make the Difference*, Ebony (Feb. 15, 2016), https://www.ebony.com/news/restaurant-women-tippingwage/.

to servers based on servers' races." *Id.* ¶ 78; *see also id.* ¶ 79.[5]  OFW claims this race-based

tipping gap perpetuated by Darden's tipping policy exacerbates Darden's cash wage policy,

resulting in many of Darden's employees being paid a subminimum wage.  *See id.* ¶ 80.  Further,

the unmediated tipping policy "perpetuates a cycle of systemic race discrimination against people

of color . . . ." *Id.* ¶ 81.

Based on the above, OFW asserts the following causes of action: (1) Sex based disparate

impact in violation of Title VII, 42 U.S.C. § 2000e-2(a) with respect to Darden's cash wage policy

employees; (2) Race based disparate impact in violation of Title VII, 42 U.S.C. § 2000e-2(a) with

respect to Darden's tipping policy.

### 3.  Organizational Injury

OFW argues it has been injured by these policies because it has been "forced to divert its

resources to address Darden employees' complaints that they have suffered more and worse sexual

harassment than their coworkers of the same sex who are not subject to the policies, as well as

complaints from Darden employees of color that they have received less in tips than their white

coworkers."  FAC ¶ 8.  OFW explains that its organizational purpose is "lobbying against

subminimum cash wage policies and unmitigated tipping policies."  *Id.* ¶ 97.  OFW states its

"most valuable resource" in effectuating its purpose is "employee voices."  *Id.* ¶ 98.  OFW

explains that its "mission hinges on legislators, employers, restaurant industry groups, and voters

hearing first-hand from workers who suffer from subminimum cash wage policies and unmitigated

tipping policies."  *Id.* ¶ 94. "However, because Darden maintains these policies, Darden has forced

these employees to [ ] spend their non-work hours recovering from and dealing with the increased

sexual harassment . . . or . . . the race-based earnings deficit they suffer[] at work."  *Id.* ¶ 92.

As a consequence, OFW argues that Darden employees cannot aid OFW "during their non-

work hours by sharing first-hand at lobbying events how such policies subject them to poverty

---

[5] Vince Dixon, The Case Against Tipping in America, https://www.eater.com/a/case-against-tipping (citing Zachary Brewster et al., Consumer Racial Profiling in U.S. Restaurants: Exploring Subtle Forms of Service Discrimination Against Black Diners, 29 Sociological Forum 476 (2014)); Meryl Kornfield, An Olive Garden Customer Demanded a Non-Black Server.  The Manager Who Complied Has Been Fired., Wash. Post (Mar. 5, 2020), https://www.washingtonpost.com/food/2020/03/05/olive-garden-managerblack-server/.

United States District Court
Northern District of California

1    wages and other horrific terms and conditions of employment." *Id.* ¶ 91.  According to OFW, this

2    forces OFW to divert its resources "to help Darden employees who have suffered disparate impact

3    because of either or both of these policies in an effort to free up those employees' non-work

4    time—non-work time taken by Darden because it maintains these illegal policies—and enable

5    such employees to help [OFW] advocate against such policies." *Id.* ¶ 94.

6         OFW then notes specific examples of direct services it is allegedly forced to provide in an

7    effort to free up Darden employees' non-work time.  These include, "connecting complaining

8    Darden workers with attorneys. . ., connecting sexual harassment survivors at Darden with

9    therapists and other social services providers, and offering job opportunities and administering

10   payments from a Coronavirus Emergency Relief Fund" to complaining workers.  *Id.*  In addition,

11   OFW claims that because these policies prevent Darden employees from directly participating in

12   lobbying efforts, it has been forced to divert "significant staff time to conducting the Survey"

13   demonstrating that Darden's policies lead to increased sexual harassment and lower tips for

14   employees of color.  *See id.* ¶ 98.  To that end, OFW argues it was forced to conduct the "Survey

15   out of self-preservation," because employee voices—its most valuable resource—were silenced

16   because of the policies.  *Id.*  However, OFW does not provide an example of a Darden employee

17   who would have assisted in OFW's lobbying efforts were it not for the challenged policies.

18                              **III.    LEGAL STANDARD**

19   A.    Rule 12(b)(1)

20         "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction

21   under [Rule] 12(b)(1)."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  The

22   "irreducible constitutional minimum" of standing requires that a "plaintiff must have (1) suffered

23   an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that

24   is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330,

25   338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  These three elements

26   are referred to as, respectively, injury in fact, causation, and redressability.  *Planned Parenthood*

27   *of Greater Was. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th

28   Cir. 2020).  The alleged injury in fact must be "concrete, particularized, and actual or imminent."

United States District Court
Northern District of California

7

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For an injury to be 'particularized,' 'it must affect the plaintiff in a personal and individual way[,]'" *Spokeo*, 578 U.S. at 339, and "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Ramirez*, 141 S. Ct. at 2205. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements[.]" *Spokeo*, 578 U.S. at 338 (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).

A Rule 12(b)(1) jurisdictional attack may be factual or facial. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack," "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). However, those inferences must be reasonable (or plausible). *See Maya*, 658 F.3d at 1070.

"[I]n a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1038. In resolving such an attack, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* Moreover, the court "need not presume the truthfulness of the plaintiff's allegations." *Id.*

Either way, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 882 (9th Cir. 2001) (in assessing standing, the court may consider "the complaint and any other particularized allegations of fact in affidavits or in amendments to the complaint").

8

B.      Organizational Standing

        "Organizations are entitled to sue on their own behalf for injuries they have sustained."
*Havens Realty*, 455 U.S. at 379 n.19.  "An organization may satisfy the Article III requirement of
injury in fact if it can demonstrate: (1) frustration of its organizational mission by the defendant's
actions; and (2) diversion of its resources to combat that frustration."  *Smith v. Pac. Props. and
Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (alterations in original).  It is not enough to
"manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a
problem that otherwise would not affect the organization at all."  *La Asociacion de Trabajadores
de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  An organization "must
instead show that it would have suffered some other injury if it had not diverted resources to
counteracting the problem."  *Id.*

## IV.      **LEGAL ANALYSIS**

A.      Article III Standing

        OFW argues that it is injured by Darden's policies because the policies force Darden
employees to deal with increased sexual harassment and racial discrimination, the impacts of
which the employees must deal with during non-work hours that they would otherwise devote to
assisting OFW in its lobbying and advocacy efforts.  This, in turn, prevents OFW from
effectuating its organizational purpose of lobbying against "subminimum cash wage policies and
unmitigated tipping policies" through the use of employee voices.  FAC ¶¶ 97–98.  Thus, OFW
alleges that it must divert resources to assisting Darden employees with the immediate impacts of
sexual harassment and racial discrimination so the employees are available to assist OFW with its
organizational mission; that is, OFW argues that if it does not divert resources to curing the
immediate effects of Darden's policies, OFW would suffer the injury of losing the employee
voices essential to effectuating its core lobbying and advocacy mission.

        Darden contends that its policies have not impaired OFW's ability to carry out its mission,
and OFW's decision to divert monetary and non-monetary resources to Darden employees
allegedly impacted by Darden's policies is voluntary.  Darden asserts that "OFW's amended
complaint is devoid of facts that demonstrates how its organization would be in peril but for it

9

1    spending time and money assisting Darden employees subject to Darden's purported unlawful

2    employment policies."  Mot. at 2.

3            According to OFW, its standing is mandated by *Haven's Realty*.  In *Havens Realty*, the

4    alleged purpose of the plaintiff organization, Housing Opportunities Made Equal ("HOME"), was

5    to provide housing counseling services and to investigate housing discrimination.  *See Havens*

6    *Realty Corp. v. Coleman*, 455 U.S. 363, 368 (1982).  The suit arose when Havens Reality—an

7    apartment complex—told a black HOME counselee that it had no vacancies.  *Id.*  HOME then sent

8    two of its employees—one black and one white—to inquire about apartment availability at the

9    Havens complex and determine whether Havens Realty practiced racial steering.  *Id.*  The "tester"

10   employees each made inquiries on three separate days, and on each occasion the black employee

11   was told that that no apartments were available whereas the white employee was told that

12   apartments were available.  *Id.*  The Supreme Court held that because Havens' "steering practices

13   have perceptibly impaired HOME's ability to provide counseling and referral services for low-

14   and moderate-income homeseekers, there can be no question that the organization has suffered

15   injury in fact."  *Id.* at 379.  Specifically, "HOME's work was sabotaged, its activity of 'provid[ing]

16   truthful counseling' was 'directly interfered with' when Havens lied to its counselee."  Ryan

17   Baasch, *Reorganizing Organizational Standing*, 103 VA. L. REV. ONLINE 18, 30 (2017) (quoting

18   *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014)).

19           *Haven Realty* is not dispositive.  Here, the asserted injury to OFW is far more attenuated.

20   OFW may have sufficiently alleged that Darden's policies directly injure Darden employees, but

21   unlike in *Havens Realty*, where Havens directly interfered with *HOME's* operations, OFW has

22   failed to allege a sufficient nexus between that injury to Darden employees and an injury to *OFW*

23   as an organization.  OFW does not contend its mission is to provide direct services to employees,

24   analogous to HOME in *Haven's Realty*.  Rather, its mission is to lobby and advocate.  The

25   asserted organizational injury—impairment of its lobbying and advocacy efforts—is indirect and

26   derivative of the putative effect of the challenged policy on employee free time.  The nexus is not

27   obvious.  The assertion appears speculative.  There is no evidence that but for the challenged

28   policies, Darden employees victimized by the policy would assist OFW's advocacy efforts.  In

United States District Court
Northern District of California

10

1    fact, it would seem that the challenged policies would drive impacted employees to OFW;

2    generally, employees burdened with an unfair or unlawful practice, whether it be non-payment of

3    due wages, discrimination, or dangerous working conditions, would be incentivized to work with

4    an organization such as OFW to protect their rights.  There is no showing that employees subject

5    to increased harassment or discrimination cannot find the time and will not make the effort to

6    volunteer their stories to OFW.

7           This case also stands in contrast to *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640,

8    663–65 (9th Cir. 2021), where plaintiffs—legal services organizations with the mission of

9    assisting migrants seeking asylum—challenged an asylum restriction rule (the "Rule") which

10   stripped asylum eligibility from every migrant that crossed into the United States between

11   designated ports of entry.  As in *Havens Realty*, it was clear in *East Bay Sanctuary* that the Rule

12   "perceptibly impaired" plaintiffs' ability to fulfil their organizational purposes: "[B]ecause the

13   Rule significantly discourages a large number of [asylum-seekers] from seeking asylum given

14   their ineligibility, the Rule frustrates their mission." *Id.* at 663 (citation and quotation marks

15   omitted).  Moreover, because some of the *East Bay Sanctuary* plaintiffs received funding per

16   client assisted, an overall reduction in clientele threatened their economic existence. *Id.* at 664.  In

17   short, there was no attenuation to the injury in *East Bay Sanctuary*—the Rule directly limited

18   those who the plaintiffs could assist by rendering asylum-seekers legally ineligible for the services

19   the plaintiffs provided.  Thus, the nexus between the Rule and the plaintiffs' injury was direct and

20   obvious.

21          *National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015), is also

22   distinguishable.  There, plaintiffs—public interest organizations with the purpose of registering

23   voters—alleged that the state of Nevada was failing to comply with Section 7 of the National

24   Voter Registration Act ("NVRA") of 1993.  *Id.* at 1035–36.  "Section 7 requires states to distribute

25   voter registration materials and to make assistance available to people who visit, and make certain

26   requests of, public assistance offices."  *Id.*  According to the plaintiffs in *National Council of La

27   Raza*, they were forced to significantly increase their voter registration efforts, at the expense of

28   other advocacy activities, due to Nevada's noncompliance.  *Id.* at 1036–37.

1    Importantly, the plaintiffs provided substantial evidence that Nevada had not only failed to

2    comply with Section 7 of the NVRA, but that this failure resulted in a significant reduction in

3    voter registration, requiring plaintiffs to increase their registration efforts.  Plaintiffs demonstrated,

4    *inter alia*, "that the number of voter registration applications submitted to Nevada public

5    assistance offices 'decreased precipitously.'" *Id.* at 1036.  As a result, in order to effectuate their

6    purpose, the plaintiffs were forced to shift their focus from registering voters the "NVRA's

7    provisions do not reach, increasing their voter education efforts, or any other activity that advances

8    their goals[,]" toward compensating for Nevada's noncompliance which resulted in significantly

9    reduced voter registration.  *Id.* at 1040.

10    *National Council of La Raza* illustrates that where the nexus between an injury and the

11    complained of conduct is indirect and arguably attenuated, the plaintiff must provide some

12    evidence establishing the nexus.  The plaintiffs in *National Council of La Raza* provided sufficient

13    evidence to demonstrate that Nevada's noncompliance with the NVRA caused a decrease in voter

14    registrations, and that this decrease injured plaintiffs by forcing them to increase their voter

15    registration efforts.  Here, the causal chain of injury is much more attenuated and speculative, and

16    is not substantiated by any specific allegation or proof.  In the case at bar, the connection between

17    the complained of injury to Darden employees, and that to OFW's lobbying efforts, is not

18    "concrete [and] particularized."  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)

19    Finally, as a consequence of the speculative nature of the alleged injury, OFW is likewise

20    unable to sufficiently establish causation and redress.  *See Simon v. E. Kentucky Welfare Rts. Org.*,

21    426 U.S. 26 (1976); *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) ("To

22    survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of

23    causation' between defendants' action and their alleged harm that is more than 'attenuated.'"

24    (citation and footnote omitted)).  In *Simon*, the court explained that "the 'case or controversy'

25    limitation of Art. III [ ] requires that a federal court act only to redress injury that fairly can be

26    traced to the challenged action of the defendant, and not injury that results from the independent

27    action of some third party not before the court." *Id.* at 41–42.  Thus, plaintiffs lacked standing to

28    challenge an IRS regulation that allegedly encouraged non-defendant hospitals to accept indigent

1    patients because it was not clear that enjoining the regulation would cause the third-party hospitals

2    to accept indigent patients.  *Id.*

3        Here, whether Darden employees' failure to assist OFW in its lobbying efforts can be

4    traced to the effects of the challenged policies is speculative, at least on the current record.  The

5    FAC does not provide a single example in which a Darden employee sought to lobby on OFW's

6    behalf but was prevented from doing so due to Darden's policies.  OFW appears to believe the

7    inference is obvious given the amount of time OFW employees spend helping Darden employees

8    with specific discrimination claims, but that inference is based solely on OFW's bald assertion—

9    OFW provides little more than a vague suggestion that Darden employees would actually lobby

10   for OFW but for the challenged policies.  Darden employees may well only involve themselves

11   with OFW because it is now offering "worker center" services; nothing indicates that the same

12   Darden employees would, as a result, involve themselves with OFW's lobbying and advocacy

13   efforts.  For the reasons stated above, the causal chain is too attenuated.

14       By extension, it is not clear that a favorable ruling would redress the specific injury OFW

15   alleges.  Because OFW has not sufficiently alleged that Darden employees would lobby on their

16   behalf in the absence of Darden's policies, it is speculative that enjoining those policies would

17   result in those employees lending their voices to OFW.[6]

18       To be sure, a "causal chain does not fail simply because it has several 'links,' provided

19   those links are 'not hypothetical or tenuous' and remain 'plausib[le].'"  *Maya*, 658 F.3d at 1070

20   (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)).  But, in the

21   absence of specific allegations and evidence, the asserted link here is hypothetical, tenuous, and

22   not plausible.

23   ///

24   ///

25   ///

26

27   _____

28   [6] Indeed, if the Court granted OFW's requested relief, it could be argued that Darden employees would no longer be negatively impacted by Darden's policies and may therefore be less inclined to join OFW's lobbying efforts.

*United States District Court*
*Northern District of California*

13

**V.      CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Darden's 12(b)(1) motion to dismiss OFW's complaint for lack of standing without prejudice.  OFW may amend its complaint to sufficiently allege a nexus between the injury to Darden employees and OFW's organizational injury.  OFW is granted thirty (30) days from the date of this order to file an amended complaint. If it fails to do so, the case will be dismissed with prejudice.

This order disposes of Docket No. 44.


**IT IS SO ORDERED**.


Dated: August 17, 2023

_____
EDWARD M. CHEN
United States District Judge