United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ONE FAIR WAGE, INC.,<br><br>      Plaintiff,<br><br>   v.<br><br>DARDEN RESTAURANTS INC.,<br><br>      Defendant. | Case No. 21-cv-02695-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Docket No. 59 |

Plaintiff One Fair Wage, Inc. ("OFW") has sued Darden Restaurants, Inc. for employment discrimination based on sex and race in violation of Title VII. Previously, following remand from the Ninth Circuit, the Court dismissed OFW's first amended complaint ("FAC") on the basis that it had failed to establish Article III standing to pursue its claims. The Court, however, gave OFW leave to amend. OFW filed a second amended complaint ("SAC"), and Darden has now moved to dismiss that pleading, again based on lack of Article III standing. Darden also argues that OFW lacks statutory standing to proceed with the suit.

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **DENIES** the motion to dismiss for lack of Article III standing. However, the Court essentially reinstates its prior order dismissing the case for lack of statutory standing and the motion to dismiss is **GRANTED** to that extent.

## I.     FACTUAL & PROCEDURAL BACKGROUND

As alleged, OFW is an "organization seeking to lift millions of tipped and subminimum-wage-earning employees nationally out of poverty by requiring all employers to pay the full minimum wage as a cash wage with fair, non-discriminatory tips on top. [OFW] focuses

1    specifically on helping employees in the restaurant industry." SAC ¶ 7.

2       "Darden is the largest operator of full-service restaurants in the world. It operates eight

3 prominent restaurant chain brands, including The Olive Garden, LongHorn Steakhouse, and the

4 Capital Grille." SAC ¶ 8.

5       OFW initially filed suit against Darden in April 2021. *See* Docket No. 1 (complaint). In

6 its complaint, it alleged that Darden had two policies relating to wages and tipping that resulted in

7 sex and race-based discrimination. Those policies are referred to as the "cash wage policy" and

8 the "tipping policy." Below is how the policies are described in the operative SAC.

9 A.    <u>Cash Wage Policy</u>

10       Under federal law, an employee may be paid less than the minimum wage (*i.e.*, a

11 subminimum wage) if she gets tips *and* the combined total of the employee's wages and tips meet

12 the minimum wage. *See* SAC ¶ 2. If the combined total does not meet the minimum wage, then

13 the employer has to make up the difference, *i.e.*, to bring the employee up to the minimum wage.

14 *See* SAC ¶ 2.

15       Darden has a policy that requires local managers to pay the lowest, legally-permissible

16 cash wage to all tipped employees. *See* SAC ¶¶ 2, 17-18. This has resulted in increased sexual

17 harassment of tipped employees. *See* SAC ¶ 33 ("Darden employees paid a subminimum wage

18 pursuant to the cash wage policy suffered more and worse sexual harassment than Darden

19 employees paid at least the minimum wage."). "Empirical evidence confirms that paying a

20 subminimum wage increases sexual harassment." SAC ¶ 61 (citing reports such as *The Glass*

21 *Floor: Sexual Harassment in the Restaurant Industry* as well as a survey conducted by OFW). So

22 does anecdotal evidence. *See* SAC ¶ 66 (citing articles). The increased sexual harassment is

23 attributable to managers, coworkers, and customers. *See* SAC ¶ 61. This occurs in several ways.

24 For example:

25         •   *Managers.* "[A] subminimum wage puts great pressure on tipped employees to

26            have the customers, rather than Darden, pay their employees their legally-required

27            wages." SAC ¶ 4. The greater the tips, the less likely Darden has to make up the

28            difference in order to satisfy the minimum wage. "This, in turn, means that

United States District Court
Northern District of California

managers have an incentive to ignore, indulge, or even encourage sexual harassment, including requiring or encouraging employees to flirt or dress suggestively."  SAC ¶ 4; *see also* SAC ¶ 62 (citing *The Glass Floor* report which "found that female employees paid a subminimum wage were 'three times more likely to be told by management to alter their appearance and to wear sexier, more revealing clothing'").  In addition, "managers sexually harass subminimum wage workers more than other workers because subminimum wage workers protest less out of a well-founded fear that managers will retaliate by assigning them worse shifts or less-desirable sections of the restaurant, thereby leading to less tips."  SAC ¶ 62.

- *Coworkers.*  "Similarly, cooks and other 'back-of-the house' workers sexually harass subminimum wage workers more than other workers because subminimum wage workers protest less out of a well-founded fear that these coworkers will retaliate by preparing food in a way that doesn't match customers' demands, again leading to less tips."  SAC ¶ 62; *see also* SAC ¶ 64 (citing *The Glass Floor* report).

- *Customers.*  "[B]ecause employees depend on receiving enough tips to survive, 'customers can feel entitled to treat servers inappropriately,'" SAC ¶ 63 (citing, *e.g.*, *The Glass Floor* report), and employees begrudgingly acquiesce to such conduct (particularly as they may also suffer retaliation from management if they reject the conduct).  *See* SAC ¶ 65 (citing, *inter alia*, *The Glass Floor* report).  Furthermore, "by being forced or encouraged to dress suggestively or flirt to get more tips, that worker is more vulnerable to sexual harassment from customers."  SAC ¶ 63.

B.     Tipping Policy

Darden has a "policy or practice of encouraging and facilitating tipping for jobs like servers and bartenders, which results in customers directly determining a substantial part of these tipped employees' total wages."  SAC ¶ 70; *see also* SAC ¶ 28 ("The intent and effect of Darden's policy is that Darden's customers directly determine a large portion of the wages paid to Darden's

United States District Court
Northern District of California

tipped employees.").  "But Darden has failed to mediate that process (*e.g.*, ensure that customers do not consider race or any other prohibited characteristics in deciding what amount to tip, to ensure that employees' take-home pay is untainted by such considerations)," SAC ¶ 70, which results in racial or ethnic minorities being tipped less than their white counterparts.  For instance:

- Racial and ethnic minorities tend to be tipped less, as indicated by, *inter alia*, a poll that OFW conducted of Darden workers, *see* SAC ¶ 71 (alleging that "Darden's servers of color who received any tips in 2020 received roughly 82.04% of the tips per hour that Darden's white servers who received any tips in 2020 received"); SAC ¶¶ 76-77 (citing articles on racially discriminatory tipping), but Darden has not taken any steps to "stop the practice of customers setting wages by caprice rather than merit."  SAC ¶ 70.

- Also, the tipping policy allows "local manager biases to affect employees' wages. Forcing employees to be paid in tips without mediating that process places great importance on the shifts worked and sections covered for at least two reasons: dinner shifts and shifts on prime nights like weekends generally result in higher tips than lunch shifts and shifts on weekdays; and prime seating sections within each restaurant generally result in higher tips than non-prime sections because customers in prime sections may be wealthier, spend more money, or be used to paying higher tips.  But Darden's tipping policy has the effect of local managers relegating servers of color and bartenders of color to less-lucrative shifts and less-prime sections, which results in them receiving less in tips based on their race."  SAC ¶ 72.

Similar to above, empirical research shows that the disparity in tipping between racial/ethnic minorities and their white counterparts  "is a predictable consequence of maintaining a policy or practice of encouraging and facilitating tips without mediation"; also, anecdotal evidence confirms that customers generally tip white servers more than servers of color.  *See* SAC ¶¶ 76-77 (citing multiple articles).[1]

---

[1] According to Plaintiffs, Darden could have profitably operated without its cash wage and tipping

C.      Order re Statutory Standing

Darden responded to the original complaint with a motion to dismiss in which it argued, *inter alia*, lack of Article III and statutory standing.  The Court declined to address the issue of Article III standing but did hold that OFW lacked statutory standing to proceed with its claims. *See* Docket No. 30 (Order at 23, 28).  It explained as follows:

> Simply put, OFW cites no case law establishing that a non-employee – here, an advocacy organization – has standing to challenge an employment practice, particularly where the alleged injury it contends renders it "aggrieved" is either purely ideological or entirely derivative of the injury directly suffered by actual employees.
>
> The sweeping and implausible nature of OFW's statutory standing theory is underscored by the fact that, if accepted, it would circumvent class certification pursuant to Rule 23 and its requirements of numerosity, commonality, typicality, and adequate representation for class certification under Rule 23(a) and (where monetary relief is sought) predominance superiority, and manageability under Rule 23(b)(3).  OFW's broad standing approach would ignore the protection afforded to the class via Rule 23's requirements of notice, objection rights, and judicial scrutiny of any class settlement.  This is particularly pertinent here, as there may well be employees who object to the changes sought by OFW to eliminate unmediated tipping.  Under OFW's proposed procedure, any advocacy organization such as OFW could sidestep Rule 23 and sue for what is tantamount to classwide relief – as OFW effectively seeks here.

Docket No. 30 (Order at 28).

OFW appealed, and the Ninth Circuit reversed on the ground that this Court "was obligated to resolve first whether OFW had Article III standing, unless it can explain why another issue – including OFW's standing to bring suit under Title VII – is dispositive and subject-matter adjacent, thus coming within the *Steel Co.* line of cases."  Docket No. 37 (9th Cir. Order at 7).

D.      Order re Article III Standing

On remand, the Court allowed OFW to file a FAC so as to support Article III standing.

---

policies.  *See, e.g.*, SAC ¶ 83 (suggesting that, instead of the cash wage policy, Darden could have had a policy under which there was a "cash wage ceiling equal to the non-tipped minimum wage"); SAC ¶ 86 (suggesting that, instead of the tipping policy, Darden could have, *e.g.*, "requir[ed] employees to pool their tips" or "minimiz[ed] the effects of tipping by adding a standard service charge to all bills to be paid to employees and letting customers tip on top (which very few do, thereby bypassing most customers' tip choices)").

United States District Court
Northern District of California

1    *See* Docket No. 42 (minutes).  Darden then moved to dismiss.  In August 2023, the Court granted

2    the motion to dismiss for lack of Article III standing.

3    　　　The Court noted that the injury claimed by OFW was speculative.  *See* Docket No. 54

4    (Order at 12).  OFW asserted that it was injured as a result of Darden's policies because the

5    policies resulted in increased sexual harassment and in racial discrimination to Darden employees,

6    and employees had to deal with the impacts of such harassment and discrimination "during non-

7    work hours that they would otherwise devote to assisting OFW in its lobbying and advocacy

8    efforts."  Docket No. 54 (Order at 9).  The Court stated: "OFW may have sufficiently alleged that

9    Darden's policies directly injure Darden employees, but unlike in *Havens Realty*, where Havens

10   directly interfered with *HOME's* operations, OFW has failed to allege a sufficient nexus between

11   [1] that injury to Darden employees and [2] an injury to *OFW* as an organization."  Docket No. 54

12   (Order at 10) (emphasis in original).  "There is no showing that employees subject to increased

13   harassment or discrimination cannot find the time and will not make the effort to volunteer their

14   stories to OFW."  Docket No. 54 (Order at 11).

15   　　　The Court then stated that, "as a consequence of the speculative nature of the alleged

16   injury, OFW is likewise unable to sufficiently establish causation and redress."  Docket No. 54

17   (Order at 12).

18   　　　　　　Here, whether Darden employees' failure to assist OFW in its
19   　　　　　　lobbying efforts can be traced to the effects of the challenged
     　　　　　　policies is speculative, at least on the current record.  The FAC does
20   　　　　　　not provide a single example in which a Darden employee sought to
     　　　　　　lobby on OFW's behalf but was prevented from doing so due to
21   　　　　　　Darden's policies.

22   Docket No. 54 (Order at 13).  "Darden employees may well only involve themselves with OFW

23   because it is now offering 'worker center' services; nothing indicates that the same Darden

24   employees would, as a result, involve themselves with OFW's lobbying and advocacy efforts."

25   Docket No. 54 (Order at 13).

26   　　　The Court thus dismissed OFW's FAC but gave the organization leave to amend "to

27   sufficiently allege a nexus between the injury to Darden employees and OFW's organizational

28   injury."  Docket No. 54 (Order at 14).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    E.    SAC's Allegations re Standing

2          OFW has now filed its SAC.  In the SAC, OFW continues to challenge Darden's cash

3    wage policy and tipping policy as described above.  *See also* Opp'n at 3 (summarizing the two

4    policies).  The SAC also contains new allegations on standing.  These allegations begin at ¶ 90.

5    To wit:

6          •    OFW's "core mission" is to "lobby[] and advocat[e] to end subminimum cash wage

7                policies and unmitigated tipping policies."  SAC ¶ 97.

8          •    "If Darden did not maintain policies, many Darden employees would be ready,

9                willing, and able to aid One Fair Wage in lobbying against subminimum cash wage

10               policies and unmitigated tipping policies during their non-work hours by sharing

11               first-hand at lobbying events how such policies subject them to poverty wages and

12               other horrific terms and conditions of employment."  Compl. ¶ 91.

13         •    "However, because Darden maintains these policies, Darden has forced these

14               employees to instead spend their non-work hours recovering from and dealing with

15               the increased sexual harassment they suffered at work (e.g., getting therapy from

16               mental healthcare professionals, seeking support from and brainstorming

17               harassment avoidance and mitigation techniques with their family and friends,

18               working extra hours and other jobs to make up for the decreased pay they receive

19               due to the increased sexual harassment, or working with an attorney to pursue

20               sexual harassment dispute resolution against Darden) or recovering from and

21               dealing with the race-based earnings deficit they suffered at work (e.g., seeing a

22               therapist to deal with the negative effects of taking home such paltry and lesser tips

23               because of their race, working extra hours and other jobs to make up for the paltry

24               and lesser tips they received due to their race; working with an attorney to pursue

25               race discrimination dispute resolution against Darden)."  SAC ¶ 92.

26         •    "As a result of Darden's policies eating up its employees' precious non-work time

27               – time that otherwise could have and would have been spent helping One Fair

28               Wage pursue their shared interest – One Fair Wage has been forced to work harder

7

United States District Court
Northern District of California

and expend more of its time, energy, focus, and resources to secure as advocates workers who have experienced the harms wrought by subminimum cash wage policies and unmitigated tipping policies and are ready, willing, and able to speak out against those policies in lobbying efforts." SAC ¶ 93; *see also* SAC ¶ 98 (alleging that the policies have "deprived One Fair Wage of its most valuab[l]e resour[c]e – employee voices – forcing One Fair Wage to conduct [a] Survey out of self-preservation").

- OFW has two concrete examples in which a Darden employee would have been a volunteer/voice for OFW but for Darden's cash wage and/or tipping policies.

  o *Jillian Melton.* Ms. Melton is a Black woman who worked as a server, bartender, and trainer for Darden at its Seasons 52 restaurant in Memphis, Tennessee, from 2014 until 2020. *See* SAC ¶ 101. Ms. Melton experienced and witnessed race-based tip differentials because, *e.g.*, "her managers would not assign sections of the restaurant with bigger parties who were more likely to tip her or other servers of color, assigning those sections instead to white servers because of their race." SAC ¶ 103. Also, Ms. Melton was sexually harassed by customers who "knew they had power over employees [such as her] who were paid a subminimum cash wage with tips on top" – *e.g.*, customers "would place their hands around her waist, grab her arm suggestively, make sexual comments about how she was shaped or how pretty she was, or invite her back to their house." SAC ¶ 105. Ms. Melton's manager further forced her to serve customers even if they had sexually harassed her. *See* SAC ¶ 106. Ms. Melton assisted OFW, both when she worked for Darden as well as after. *See* SAC ¶ 111. For example, OFW researchers interviewed Ms. Melton for reports on the effects of the subminimum wage on restaurant workers and cited her in their published research. *See* SAC ¶ 112. "[Ms.] Melton always wanted to do more to help [OFW], but she was unable to do so"; "the low tips she

8

1   received and the sexual harassment she endured made it hard to participate

2   at the level that she desired while still making a living."  SAC ¶ 113; *see*

3   *also* SAC ¶ 114 (alleging that Ms. Melton was forced "to put in even more

4   hours at Darden, thereby forfeiting her ability to help One Fair Wage

5   further").  "[Ms.] Melton was also afraid that Darden might retaliate against

6   her if she spoke out too much about that discrimination and harassment

7   because many of the restaurants in Memphis were operated by Darden."

8   SAC ¶ 115; *see also* SAC ¶ 117 (alleging that two of Ms. Melton's

9   coworkers similarly feared retaliation).

10   o  *Zain Youssef.*  Mr. Youssef is a Middle Eastern man who worked as a server

11   at Darden's Olive Garden restaurant in Jacksonville, Florida, in 2017 and

12   then again in 2023.  *See* SAC ¶ 118.  Mr. Youssef experienced and

13   witnessed race-based tip differentials because, *e.g.*, "his managers would

14   assign better tables with bigger parties who would tip more, better sections

15   of the restaurant with larger tables likely to tip more, and better shifts (like

16   Friday nights) with greater tips to white servers than they would assign to

17   servers of color like Youssef because of their races."  SAC ¶ 120.  "Because

18   of [his] paltry tip earnings, which were lower than they should have been

19   because of his race, as well as the multiple jobs those earnings forced him to

20   work, [Mr.] Youssef had practically no free time to symbolically repay One

21   Fair Wage for its cash assistance[2] and lobbying efforts by appearing at

22   One Fair Wage lobbying events in 2023 or being interviewed by One Fair

23   Wage's researchers for its research papers."  SAC ¶ 127.  "Had [Mr.]

24   Youssef not been paid less in tips because of his race and not been forced to

25   work a second job to make ends meet, [Mr.] Youssef would have

26   volunteered to help One Fair Wage in his free time."  SAC ¶ 128; *see also*

27

28   [2] During the COVID-19 pandemic, OFW provided Mr. Youssef with cash assistance from its Emergency Coronavirus Relief Fund.  *See* SAC ¶ 124.

United States District Court
Northern District of California

SAC ¶ 129 (alleging that, according to OFW's Chief of Staff, Senior
Director, and Co-Founder (Fekkak Mamdouh), "it is common for recipients
of cash assistance from the Fund to want to help One Fair Wage," but they
cannot because they do not "have enough free time to do so [as] they need
to work more to offset their discriminatorily low wages; they are spending
their non-work time dealing with the repercussions of discrimination and/or
harassment; and they fear retaliation from Darden . . . if they speak out").

- In addition to the above, "One Fair Wage has expended its resources to help
Darden employees who have suffered disparate impact because of either or both of
these policies in an effort to free up those employees' non-work time . . . and
enable such employees to help One Fair Wage advocate against such policies.  For
example, One Fair Wage has spent its resources connecting complaining Darden
workers with attorneys to represent them in dispute resolution against Darden,
connecting sexual harassment survivors at Darden with therapists and other social
service providers, and offering job opportunities and administering payments from
a Coronavirus Emergency Relief Fund to Darden workers who complained of
increased sexual harassment and/or race-based tip differentials."  SAC ¶ 94
(emphasis added).  One Fair Wage has spent time on this activity "instead of
spending its time lobbying or advocating."  SAC ¶ 95.

- One Fair Wage's President (Saru Jayaraman) spends "significant" time "dealing
with complaints from Darden employees who would prefer to be spending their
non-work time lobbying against subminimum cash wages and unmitigated tipping
policies, but cannot due to the effects of Darden's policies."  SAC ¶ 96.  In
addition, One Fair Wage's Research Director (Julia Sebastian) "spends roughly
one-fourth of her time . . . dealing with such complaints from Darden employees
and otherwise responding to the effects of the policies on those employees instead
of directing her efforts toward lobbying."  SAC ¶ 96.  Moreover, "[m]any other
One Fair Wage employees and consultants have spent at least a portion of their

10

1   work time dealing with such complaints and otherwise responding to the effects of

2   the policies on Darden employees instead of organizing and hosting lobbying or

3   advocacy events."  SAC ¶ 97.

## II.     DISCUSSION

A.     Legal Standard

        A motion to dismiss for lack of standing is brought pursuant to Federal Rule of Civil

Procedure 12(b)(1).  *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th

Cir. 2010) (noting that, "[b]ecause standing and ripeness pertain to federal courts' subject matter

jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss").  Such a motion can be

facial in nature or factual.  *See Pride v. Correa*, 719 F.3d 1130, 1139 (9th Cir. 2013).

        "In a facial attack, the challenger asserts that the allegations contained in a complaint are

insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the

challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal

jurisdiction."  *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

> In resolving a factual attack on jurisdiction, the district court may
> review evidence beyond the complaint without converting the
> motion to dismiss into a motion for summary judgment.  The court
> need not presume the truthfulness of the plaintiff's allegations.
> "Once the moving party has converted the motion to dismiss into a
> factual motion **by presenting affidavits or other evidence** properly
> brought before the court, the party opposing the motion must furnish
> affidavits or other evidence necessary to satisfy its burden of
> establishing subject matter jurisdiction."

*Id.* (emphasis added).

        Where a factual motion to dismiss is made and only written materials are submitted for the

court's consideration (*i.e.*, no full-on evidentiary hearing is held), a plaintiff need only establish a

prima facie case of jurisdiction.  *See Societe de Conditionnement en Aluminum v. Hunter Eng'g*

*Co.*, 655 F.2d 938, 942 (9th Cir. 1985); *cf. Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d

1280, 1285-86 (9th Cir. 1977) (adopting that approach where personal jurisdiction is at issue).  In

other words, a plaintiff need only submit written materials "to demonstrate facts which support a

finding of jurisdiction in order to avoid a motion to dismiss." *Id.* at 1285.  If an evidentiary

hearing is held, the plaintiff has the burden of proving subject matter jurisdiction by a

United States District Court
Northern District of California

preponderance of the evidence.  *See Societe de Conditionnement*, 557 F.2d at 942; *see also Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir. 2022) (indicating that, "[a]t that point, the court may resolve any factual disputes concerning the existence of jurisdiction," unless the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits).

In the case at bar, "Darden expressly asserts both a facial and factual challenge."  Mot. at 5.  However, Darden did not provide any evidence to support its factual attack and therefore its challenge is effectively a facial one.

Darden disagrees.  Darden suggests that it was entirely within its rights to make a factual challenge without offering any evidence of its own because it is OFW's burden – as the plaintiff – to prove subject matter jurisdiction.  *See Colwell v. HHS*, 558 F.3d 1112, 1121 (9th Cir. 2009) ("In support of a motion to dismiss under Rule 12(b)(1), the moving party *may* submit 'affidavits or any other evidence properly before the court . . . . It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction.'") (emphasis added).  In other words, Darden argues that OFW's failure to provide any evidence to support subject matter jurisdiction means that Darden's motion should be granted.

If the Court were to conduct a full-on evidentiary hearing on the issue of subject matter jurisdiction, and OFW failed to provide any evidence, Darden would be right.  However, at this juncture, despite Darden's attempt to frame its motion as a factual challenge to standing, neither Darden nor OFW has submitted any evidence.  Thus, as a practical matter, the motion necessarily turns on the pleadings only, and thus OFW  need only establish a prima facie case of subject matter jurisdiction.  So framed, it is fair to credit the allegations in OFW's pleading.

Accordingly, the Court treats the challenge made by Darden to a facial one.

B.    Standing

> To have standing, plaintiffs must establish (1) that they have
> suffered an injury in fact, (2) that their injury is fairly traceable to a
> defendant's conduct, and (3) that their injury would likely be
> redressed by a favorable decision. . . . At the pleading stage,
> "general factual allegations of injury resulting from the defendant's

1    conduct may suffice."

2    *Mecinas v. Hobbs*, 30 F.4th 890, 896-97 (9th Cir. 2022).

3         Where a plaintiff is an organization, there can be either associational standing (also known

4    as representational standing) and/or organizational standing.

5             "Organizational standing . . . turn[s] on whether the organization
              itself has suffered an injury in fact."  By contrast, associational
6             standing is where "[an organization] can establish standing only as
              representative[] of those of [its] members who have been injured in
7             fact, and thus could have brought suit in their own right."

8    *Women's Student Union v. United States Dep't of Educ.*, No. 21-cv-01626-EMC, 2021 U.S. Dist.

9    LEXIS 167220, at *13-14 (N.D. Cal. Sept. 2, 2021).

10        In the instant case, OFW asserts only organizational standing.  The Supreme Court's

11   decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), is the benchmark case on

12   organizational standing.  The organizational plaintiff in *Havens* was HOME, a nonprofit "whose

13   purpose to 'to make equal opportunity in housing a reality in the Richmond Metropolitan Area. . . .

14   Its activities included the operation of a housing counseling service, and the investigation and

15   referral of complaints concerning housing discrimination."  *Id.* at 368.  HOME, along with some

16   individual plaintiffs, sued Havens, the owner of two apartment complexes, on the basis that it had

17   engaged in racial steering practices (*i.e.*, falsely telling black renters that apartments were not

18   available).  HOME claimed injury because Havens's steering practices "frustrated the

19   organization's counseling and referral services, with a consequent drain on resources."  *Id.* at 369;

20   *see also id.* at 379 (taking note of HOME's allegation that it "'has been frustrated by defendants'

21   racial steering practices in its efforts to assist equal access to housing through counseling and other

22   referral services[;] Plaintiff HOME has had to devote significant resources to identify and

23   counteract the defendant's [sic] racially discriminatory steering practices'").  The Supreme Court

24   held:

25             If, as broadly alleged, [Havens's] steering practices have perceptibly
              impaired HOME's ability to provide counseling and referral services
26             for low- and moderate-income home-seekers, there can be no
              question that the organization has suffered injury in fact.  Such
27             concrete and demonstrable injury to the organization's activities –
              with the consequent drain on the organization's resources –
28             constitutes far more than simply a setback to the organization's

1

abstract social interests.

2

*Id.*; *see also Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (discussing

3

*Havens*).

4

Based on *Havens*,

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

an organization may establish "injury in fact if it can demonstrate: **(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question**." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). For example, in *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219 (9th Cir. 2018), *as amended by* 932 F.3d 742 (9th Cir. December 7, 2018), the plaintiff organizations created "education and outreach initiatives regarding the [challenged] rule." *Id.* at 1242. In *National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015), to counteract alleged voter registration violations, civil rights groups "expend[ed] additional resources" that "they would have spent on some other aspect of their organizational purpose." *Id.* at 1039. In these cases, the plaintiffs were not "simply going about their 'business as usual,'" *id.* at 1040-41, but had altered their resource allocation to combat the challenged practices, *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding organizational standing where the plaintiffs "had to divert resources to educational programs to address its members' and volunteers' concerns about the [challenged] law's effect"); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding organizational standing where the plaintiff, in response to the defendant's challenged practices, "started new education and outreach campaigns targeted at discriminatory roommate advertising"); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943-44 (9th Cir. 2011) (finding organizational standing where resources directed toward "assisting day laborers during their arrests and meeting with workers  about the status of the [challenged] ordinance would have otherwise been expended toward [the advocacy group's] core organizing activities"); Smith, 358 F.3d at 1105 (finding organizational standing where complaint was dismissed without leave to amend and plaintiff alleged it "divert[ed] its scarce resources from other efforts" so it could "monitor the [subject] violations and educate the public regarding the discrimination"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding organizational standing where plaintiff alleged it had expended thousands of dollars to "redress[] the impact" of defendant's discrimination and, as a result, was unable "to undertake other efforts to end unlawful housing practices"); *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (finding organizational standing where plaintiffs "expend[ed] resources in representing clients they otherwise would spend in other ways").

27

*Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154-55 (9th Cir. 2019)

28

(emphasis added). Standing obtains where the plaintiff

United States District Court
Northern District of California

1

2

3

4

> would have suffered some other injury if it had not diverted
> resources to counteracting the problem.  In *Havens*, for example,
> housing discrimination threatened to make it more difficult for
> HOME to counsel people on where they might live if the
> organization didn't spend money fighting it.  The organization could
> not avoid suffering one injury or the other, and therefore had
> standing to sue.

5   *La Asociacion De Trabajadores De Lake v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir.

6   2010).

7          In *American Diabetes*, the Ninth Circuit held that the plaintiff had failed to make sufficient

8   allegations in support of standing in its complaint.  The plaintiff was a "nonprofit with a mission

9   'to prevent and cure diabetes and to improve the lives of those affected by diabetes.'"  *Am.*

10  *Diabetes*, 938 F.3d at 1150.  Activities conducted by the nonprofit in furtherance of its mission

11  included advocacy for laws that keep children with diabetes safe at school and provision of legal

12  information and assistance to individuals and families experiencing diabetes-related

13  discrimination.  *See id.*  The nonprofit sued the army on the basis that it engaged in diabetes-

14  related discrimination in its youth programs.  The nonprofit claimed that it suffered injury in its

15  own right because it had "diverted resources to combat [a] New Policy."  *Id.* at 1154.

16         The Ninth Circuit found that the nonprofit had failed to adequately allege standing.  "[T]he

17  only resource the Association claims it diverted as a result of the New Policy [being challenged] is

18  the time one of its two staff attorneys took to handle a single intake call"; this was just business as

19  usual because Association's staff attorneys

20

21

22

> dedicate a portion of their time to taking calls, and one [person] used
> that service.  The Association has not shown that, . . . as a result of
> the New Policy, the Association had altered or intended to alter its
> resource allocation to allow its attorneys to take a higher volume of
> calls or separately address the New Policy.

23  *Id.* at 1155.

24         On the other hand, in *Sabra v. Maricopa County Community College District*, 44 F.4th 867

25  (9th Cir. 2022), the Court of Appeals rejected the district court's conclusion that a nonprofit

26  organization "'committed to advocacy and protecting the civil rights of American Muslims'"

27  lacked standing to challenge a module on Islamic terrorism taught in a college course on the basis

28  that it failed to show "how its remedial actions – developing a public-awareness campaign to

United States District Court
Northern District of California

15

1    combat Islamophobia – fell outside 'the realm of [its] normal advocacy.'"  *Id.* at 878-79.  In fact,

2    the organization alleged that, "in response to [the professor's] allegedly harmful depiction of

3    Islam, it went out of its way to develop a public-awareness campaign rebutting the information in

4    [the] course, 'divert[ing] [its] resources' by contracting with a religious scholar who assisted in

5    creating materials for the campaign."  *Id.* at 880.  This was sufficient to confer Article III standing.

6    *See id.*

7    C.    Injury in Fact

8          Darden argues first that OFW has failed to establish standing because it has not suffered a

9    cognizable injury in fact.

10          As a preliminary matter, the Court notes that both parties largely focus on one specific

11    theory of injury – *i.e.*, Darden employees who want to help OFW in its advocacy efforts are unable

12    to do so because the "free" time they have (*i.e.*, not working at a Darden restaurant) is taken up by

13    working more hours (to make up for the low pay) or addressing the effects of the sex and/or race

14    discrimination.  OFW characterizes this as being *deprived* of "its most important resource" –

15    employee voices in its advocacy work.   Opp'n at 1; *see also* SAC ¶ 98 (alleging that the policies

16    have "deprived One Fair Wage of its most valuab[l]e resour[c]e – employee voices – forcing One

17    Fair Wage to conduct [a] Survey out of self-preservation").

18          This alleged impairment to OFW's resources in carrying out its mission is sufficient to

19    state a prima facie basis for standing.  OFW has addressed the deficiency previously identified by

20    the Court.  Specifically, the Court criticized OFW for making "no showing that employees . . .

21    cannot find the time and will not make the effort to volunteer their stories to OFW."  Docket No.

22    54 (Order at 11).  OFW has now provided at least two concrete examples of employees who

23    would have done more if they could have – *i.e.*, Ms. Melton and Mr. Youssef.  And it can

24    reasonably be inferred that there are others based off of other allegations in the SAC.  *See, e.g.*,

25    SAC ¶ 129 (alleging that, according to OFW's Chief of Staff, Senior Director, and Co-Founder

26    (Fekkak Mamdouh), "it is common for recipients of cash assistance from the Fund to want to help

27    One Fair Wage," but they cannot because they do not "have enough free time to do so [as] they

28    need to work more to offset their discriminatorily low wages; they are spending their non-work

United States District Court
Northern District of California

16

1   time dealing with the repercussions of discrimination and/or harassment; and they fear retaliation

2   from Darden . . . if they speak out").

3          The situation here is analogous to that in *East Bay Sanctuary Covenant v. Biden*, 993 F.3d

4   640 (9th Cir. 2021).  In *East Bay Sanctuary*, the plaintiffs were organizations that represented

5   current and future asylum seekers.  They challenged an agency rule that stripped asylum eligibility

6   from migrants who crossed into the United States between designated ports of entry.  *See id.* at

7   658.  The Ninth Circuit held that the organizations had organizational standing to file suit.

8   "'[B]ecause the Rule significantly discourages a large number of [asylum-seekers] from seeking

9   asylum given their ineligibility,' the Rule frustrates their mission."  *Id.* at 663.  In essence, the rule

10  took away the organizations' customers.  Here, Darden's conduct is (as alleged) effectively taking

11  away OFW's volunteers.

12         To the extent Darden has cited *City of Philadelphia v. Beretta U.S.A.*, 126 F. Supp. 2d 882

13  (E.D. Pa. 2000), in support, that authority is not binding on this Court.  *See id.* at 897 (stating that

14  "[i]t is . . . disturbing that the organizational plaintiffs [*i.e.*, civic organizations] argue that they

15  may sue for the costs of educational sessions and other programs which they run to counteract gun

16  violence[;] [b]y this logic, any social action organization may confer standing upon itself by

17  voluntarily spending money on the social problem of its choice").  Moreover, the *Beretta* court

18  made the statement above in assessing associational standing and not organizational standing, and

19  the statement was dicta.  The court found a standing problem based on the traceability prong of

20  standing, not the injury-in-fact prong.  *See id.* at 897 (noting that "the gun manufacturers' products

21  lawfully enter into the stream of commerce[;] [i]llegal conduct and harm to the plaintiffs only

22  occurs because of several intervening actions by independent individuals: the federally licensed

23  dealer must sell the gun[,] the straw buyer must resell it [to a felon or someone else who is not

24  able to legally obtain or possess firearms][,] the criminal must use it" – and "[n]one of these are

25  natural consequences of the gun manufacturers' distribution scheme").

26         Furthermore, the SAC suggests two more alleged injuries (albeit related to the injury

27  claimed above):

28                 (1) Because OFW has been deprived of the voices of Darden employees, it has had to

1    divert resources to finding replacement voices.  *See* SAC ¶ 93 ("As a result of

2    Darden's policies eating up its employees' precious non-work time – time that

3    otherwise could have and would have been spent helping One Fair Wage pursue

4    their shared interest – One Fair Wage has been forced to work harder and expend

5    more of its time, energy, focus, and resources to secure as advocates workers who

6    have experienced the harms wrought by subminimum cash wage policies and

7    unmitigated tipping policies and are ready, willing, and able to speak out against

8    those policies in lobbying efforts.").

9    (2) Because Darden employees have been subjected to Darden's policies, OFW has

10   had to divert its resources to help them – *e.g.*, "connecting complaining Darden

11   workers with attorneys to represent them in dispute resolution against Darden,

12   connecting sexual harassment survivors at Darden with therapists and other social

13   service providers, and offering job opportunities and administering payments from

14   a Coronavirus Emergency Relief Fund to Darden workers who complained of

15   increased sexual harassment and/or race-based tip differentials."  SAC ¶ 94

16   (emphasis added).  One Fair Wage has spent time on this activity "instead of

17   spending its time lobbying or advocating."  SAC ¶ 95; *see also* SAC ¶¶ 96-97

18   (alleging that OFW's President spends "significant" time dealing with complaints

19   from Darden employees; that OFW's Research Director (Julia Sebastian) "spends

20   roughly one-fourth of her time . . . dealing with such complaints from Darden

21   employees and otherwise responding to the effects of the policies on those

22   employees instead of directing her efforts toward lobbying"; and that "[m]any other

23   One Fair Wage employees and consultants have spent at least a portion of their

24   work time dealing with such complaints and otherwise responding to the effects of

25   the policies on Darden employees instead of organizing and hosting lobbying or

26   advocacy events").  This work seems to have been done *independent* of any effort

27   on the part of OFW to get the Darden employees to be a voice on behalf of the

28   organization.

18

1      Notably, the second injury is the typical kind of injury recognized under *Havens*.[3]  *See,*

2  *e.g.*, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943-44

3  (9th Cir. 2011) (finding organizational standing where resources directed toward "assisting day

4  laborers during their arrests and meeting with workers about the status of the [challenged]

5  ordinance would have otherwise been expended toward [the advocacy group's] core organizing

6  activities").  *Compare Am. Diabetes*, 938 F.3d at 1155 (stating that "the only resource the

7  Association claims it diverted as a result of the New Policy [being challenged] is the time one of

8  its two staff attorneys took to handle a single intake call"; this was just business as usual because

9  Association's staff attorneys dedicate a portion of their time to taking calls, and one [person] used

10  that service," and "[t]he Association has not shown that, . . . as a result of the New Policy, the

11  Association had altered or intended to alter its resource allocation to allow its attorneys to take a

12  higher volume of calls or separately address the New Policy").

13      Darden protests that this "miss[es] the big picture": that "[w]hat causes an injury to a

14  service organization is not analogous to what causes an injury to an advocacy organization."  Mot.

15  at 5; *see also* Reply at 4 (arguing that "advocacy organizations like OFW claiming injury from the

16  very conduct that birthed the organization into existence is far from analogous to standing

17  decisions concerning direct service organizations whose operations were fundamentally frustrated

18  by the defendant's actions").  But this argument is not persuasive.

19      First, the case law does not draw distinctions between service organizations and advocacy

20  organizations.  Second, it is not clear why an advocacy organization could not assert a diversion of

21  resources where it had to provide direct services it typically does not provide and the provision of

22  such services takes away from its normal advocacy efforts.  Third, the underlying argument

23  Darden seems to be making here is that its cash wage and tipping policies – the alleged

24  misconduct – "provide[] OFW with its organizational advocacy mission (*it does not frustrate*

---

[3] The Court acknowledges that, in a prior order, it commented as follows: "it does not appear that OFW's mission includes providing representation and counseling to individual employees; thus, it could be contended that providing advice and referrals to Darden employees was a voluntary activity not required pursuant to its mission."  Docket No. 30 (Order at 23).  However, the Court made no definitive ruling one way or the other as it never adjudicated Article III standing in this order.

United States District Court
Northern District of California

*mission*).  In other words, if restaurant companies, like Darden, eliminated the use of the tip credit, then OFW would have no organizational purpose."  Mot. at 6 (emphasis added).  But this argument makes no sense: OFW's mission is to *end* policies such as Darden's because they harm tipped employees; Darden's policies therefore frustrate OFW's mission.  The fact that if OFW were someday to achieve its mission to end that practice does not negate its mission.

Darden takes out of context the Court's statement from its prior order that "the challenged policies would [seem] to drive impacted employees to OFW."  Docket No. 54 (Order at 11).  Following that statement, the Court then noted that such employees "would be incentivized to work with an organization such as OFW to protect their rights" – *i.e.*, "[t]here is no showing that employees . . . cannot find the time and will not make the effort to volunteer their stories to OFW."  Docket No. 54 (Order at 11).  The Court's observation was based on the prior pleading.  The SAC now clearly asserts that at least some employees, despite their desire to join OFW's work, are in fact obstructed from doing so because of Darden's wage policies.

Accordingly, the Court finds that OFW has sufficiently alleged an injury in fact (for purposes of standing) by virtue of the fact that it has had to divert resources away from advocacy efforts so that it may provide, in effect, direct services.

D.    Traceability

Because OFW has sufficiently pled an injury in fact, the next issue is whether OFW has demonstrated that its injury "is fairly traceable to the challenged conduct of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).  Traceability requires "a causal connection between the injury and the conduct complained of."  *Id.*

The Ninth Circuit has cautioned that traceability should *not* be equated with proximate causation.  *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (noting that "Plaintiffs do not bear so heavy a burden").  While traceability "does require [a] plaintiff[] to establish a line of causation between the defendant['s] action and [the plaintiff's] alleged harm that is more than attenuated," *id.* (internal quotation marks omitted), "[a] causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausibl[e]."

*Id.* (internal quotation marks omitted).  "What matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain." *Id.* (internal quotation marks omitted); *see also Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000) (stating that "the causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits").

Notably, a "causation chain does not fail solely . . . because a single third party's actions intervened." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (internal quotation marks omitted).  On the other hand, the Supreme Court has stated that,

> where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  To satisfy that burden, the plaintiff must show at the least "that third parties will *likely react in predictable ways.*"

*California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (emphasis added; citing, *inter alia*, *Dep't of Comm. v. N.Y.*, 139 S. Ct. 2551, 2566 (2019)[4]).  Along similar lines, the Ninth Circuit has noted that,

---

[4] In *Department of Commerce v. New York*, a challenge was made to a decision by the Secretary of Commerce to reinstate a question about citizenship on the 2020 census questionnaire. The suit was brought by various plaintiffs, including state and local governments and nongovernmental organizations that worked with immigrant and minority communities. The plaintiffs claimed a number of injuries as a result of the Secretary's decision: "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources – all of which turn on their expectation that reinstating a citizenship question will depress the census response rate and lead to an inaccurate population count." *Dep't of Commerce v. New York*, 139 S. Ct. at 2565.  The federal government argued that "any harm to respondents is not fairly traceable to the Secretary's decision, because such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census." *Id.*  The federal government also argued that "[t]he chain of causation is made even more tenuous" because it was based on the third parties being "motivated by unfounded fears that the Federal Government itself will break the law by using noncitizens' answers against them for law enforcement purposes." *Id.* at 2565-66.

The Supreme Court rejected these arguments, explaining that, "in these circumstances, respondents have met their burden of showing that third parties will likely react in predictable ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." *Id.* at 2566.  "Respondents' theory of standing . . . does not rest on *mere speculation* about the decisions of third parties; it relies instead on the *predictable effect* of Government action on the decisions of third parties." *Id.* (emphasis added).

> when a plaintiff alleges that government action caused injury by influencing the conduct of third parties, we've held that "more particular facts are needed to show standing."  That's so because the third parties may well have engaged in their injury-inflicting actions even in the absence of the government's challenged conduct.  To plausibly allege that the injury was "not the result of the independent action of some third party," the plaintiff must offer facts showing that the government's unlawful conduct "is at least a *substantial factor motivating the third parties' actions*."  So long as the plaintiff can make that showing without relying on "speculation" or "guesswork" about the third parties' motivations, she has adequately alleged Article III causation.

*Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (emphasis added); *see also id.* at 1014-15 (finding traceability because "[w]hat Mendia needed to allege is that the immigration detainer was at least a substantial factor motivating the bail bondsmen's refusal to do business with him, and he's done that"; "[w]hen ICE announces that it 'seeks custody of an alien . . . for the purpose of arresting and removing the alien,' there's certainly a higher risk that, if released on bail from state custody, the alien might not be around to make his court dates").[5]

In the instant case, Darden argues that the causal connection between its policies and OFW's alleged harm is attenuated (and therefore traceability is a problem) because OFW's injury "necessarily derives from its allegations that Darden's ***customers*** sexually harass Darden's female employees and do not tip Darden's female and non-white employees equally to how they tip Darden's male and white employees."  Mot. at 7 (emphasis in original).  A similar argument based on customer preferences  applies with respect to the racial discrimination claim.

Although the parties have not done so, the Court addresses the sexual harassment claim and the race discrimination claim separately.

---

[5] The Ninth Circuit has further noted that, "[i]n cases where a chain of causation involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, the Supreme Court and this court have found the causal chain too weak to support standing at the pleading stage."  *Maya*, 658 F.3d at 1070 (internal quotation marks omitted).  *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 739, 757, 759 (1984) (where plaintiffs (parents of black public school children) sued the IRS for failing to adopt "sufficient standards and procedures to fulfill its obligation to deny tax-exempt status to racially discriminatory private schools," holding that, for purposes of standing, "[t]he line of causation between [the IRS's] conduct and desegregation of [the] schools is attenuated at best"; the chain of causation "involves numerous third parties (officials of racially discriminatory schools receiving tax exemptions and the parents of children attending such schools) who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on the ability of public school students to receive a desegregated education").

1          1.     <u>Sexual Harassment Claim</u>

2          As an initial matter, the Court notes that OFW claims the cash wage policy increases

3    sexual harassment by not only customers but also managers and coworkers.  Darden's argument

4    fails to address managers and coworkers.

5          With respect to customers, OFW contends that female employees, in order to obtain

6    desperately needed tips, must dress and behave in ways that solicit customer favor and this,

7    predictably leads to increased sexual harassment.  These allegations are plausible (indeed, are

8    arguably predictable), especially in light of the empirical and anecdotal evidence referred to in the

9    SAC which indicates subminimum wage employees do have higher incidents of sexual harassment

10   compared to minimum wage employees.  *See, e.g.*, SAC ¶ 61 (referencing a report that found

11   "'[w]omen workers earning their state's full minimum wage before tips reported half the rate of

12   sexual harassment as women in the states that pay $2.13 per hour'");

13         Moreover, as OFW points out, Darden managers know about the cash wage policy and

14   therefore have an incentive to have customers pay as much in tips as possible (*i.e.*, so that Darden

15   does not have to make up the difference); "[t]his, in turn, means that managers have an incentive

16   to ignore, indulge, or even encourage sexual harassment, including requiring or encouraging

17   employees to flit or dress suggestively."  SAC ¶ 4.  This causal chain is also plausible.  *See*

18   *Mendia*, 768 F.3d at 1014-15 (finding traceability because "[w]hat Mendia needed to allege is that

19   the immigration detainer was at least a substantial factor motivating the bail bondsmen's refusal to

20   do business with him, and he's done that"; "[w]hen ICE announces that it 'seeks custody of an

21   alien . . . for the purpose of arresting and removing the alien,' there's certainly a higher risk that, if

22   released on bail from state custody, the alien might not be around to make his court dates").

23         As for harassment by managers and/or coworkers, as noted above, Darden did not address

24   such harassment.  Consistent with the above, however, because managers likely know about the

25   cash wage policy, it is plausible that a manager would engage in sexual harassment by telling

26   employees to flirt or dress in a particular way so as to maximize tips from customers (which would

27   then let Darden off the hook in terms of making up the difference).  Although arguably a closer

28   call, it is also plausible that a manager or coworker is more likely to sexually harass a

subminimum wage employee since that employee is heavily dependent on tips as part of her wage and therefore is less willing to protest harassment when the manager or coworker could retaliate (*e.g.*, by giving a worse shift or by messing up a food order).  Again, the empirical and anecdotal evidence cited by OFW supports plausibility.

To be sure, it seems likely that, even without a cash wage policy such as Darden's, a customer could still feel entitled to act inappropriately because he is holding a tip over the employee's head, or a manager would be emboldened to sexually harass because of the power he exerts over the employee's shift.  But OFW does not dispute that there is sexual harassment in the absence of a cash wage policy.  OFW's point is simply that such a policy makes the situation worse.  This is plausible for purposes of stating a prima facie case of standing at the pleading stage.

2.    Race Discrimination Claim

For the race discrimination claim, OFW claims there are race-based tip differentials because of conduct by customers and managers – customers because they tip white employees more than nonwhite employees (an assertion apparently supported by empirical and anecdotal evidence, *see, e.g.*, SAC ¶ 71 (discussing poll conducted by OFW of Darden employees); SAC ¶¶ 76-77 (citing articles on racially discriminatory tipping)), and managers because they have the ability to assign worse shifts to nonwhite employees.

Similar to above, the Court does not find a traceability problem.  In light of the empirical and anecdotal evidence cited by OFW, the causal connection between Darden's failure to act and the race discrimination suffered by nonwhite employees is neither speculative nor attenuated; it is plausible.  *See Ecological Rts. Found.*, 230 F.3d at 1152 (9th Cir. 2000) (stating that "the causal connection . . . need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits").

E.    Redressability

Because the Court has found sufficient allegations to support traceability, redressability is similarly not an issue.  In its papers, Darden makes a redressability argument related to OFW's injury in fact based on the volunteer theory.  *See* Mot. at 8 (arguing that the Court would have to

1    "impermissibly speculate that if Darden's cash wage and tipping policies did not exist then former

2    employees like Jillian Menton and Zain Youssef would have spent more time helping OFW").

3    But Darden posits no contrary evidence, and given the posture of the current motion, the Court

4    credits the allegations because they are not implausible.  Further, Darden ignores the additional

5    injury in fact claimed by OFW based on the diversion-of-resources theory.  Furthermore, to the

6    extent Darden raises a due process concern, that seems to be an issue separate from that of

7    redressability; it appears more relevant to the issue of statutory standing.  *See* Mot. at 9 (arguing

8    that "Darden is unable to invoke the doctrine of issue preclusion on any duplicative disparate

9    impact claim asserted by any Darden employee in future litigation because said employees are not

10   in privity with OFW").

### III.    CONCLUSION

12          For the foregoing reasons, the Court rejects Darden's 12(b)(1) facial challenge to OFW's

13   Article III standing.  But, as the Court held in its prior order, OFW lacks statutory standing, and

14   therefore dismissal of this case is appropriate.  *See* Docket No. 30 (Order at 23, 28).

15          However, the Court shall temporarily defer the entry of a final judgment in favor of Darden

16   because, at the hearing, OFW suggested that the Court should reconsider its prior order holding

17   there was no statutory standing.  OFW referred the Court to the Ninth Circuit briefing on the issue.

18   Motions for reconsideration in this District are subject to Civil Local Rule 7-9.  The Court shall

19   give OFW three weeks to decide whether to file a motion for leave to file a motion for

20   reconsideration consistent with Civil Local Rule 7-9(b).  Within three weeks, OFW shall file such

21   a motion or shall file a statement indicating that it will not be filing such a motion.  If OFW does

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

United States District Court
Northern District of California

file a motion, then Darden shall have two weeks to file an opposition.  There shall be no reply absent further order of the Court.  If OFW does not file such a motion, the Court will enter final judgment.

This order disposes of Docket No. 59.

**IT IS SO ORDERED**.

Dated: March 5, 2024

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California